**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 93-3873
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SYLVESTER TOLLIVER, GERALD ELWOOD,
DANIELLE BERNARD METZ, GENNERO ARTHUR, NOAH MOORE, JR.,
MARLO HELMSTETTER, GLENN METZ, and SHANE STERLING,

Defendants-Appellants.

*****************************************************

_____

No. 93-3877
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

NOAH MOORE, JR.

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Eastern District of Texas
_____

(August 14, 1995)

Before LAY[1], DUHÉ, and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge:

_____

[1]    Circuit Judge, of the Eighth Circuit, sitting by
designation.

After a three week jury trial, including the testimony of over 100 witnesses, Appellants Glenn Metz, Danielle Bernard Metz, Noah Moore, Jr. (Moore), Gerald Elwood (Elwood), Gennero Arthur (Arthur), Marlo Helmstetter (Helmstetter), Sylvester Tolliver (Tolliver) and Shane Sterling (Sterling) (collectively Appellants) were convicted of conspiring, from 1985 to August 9, 1992, to possess cocaine with the intent to distribute (count one).  Appellants Glenn Metz and Danielle Metz were convicted of conducting a Continuing Criminal Enterprise (CCE) (counts two and three).  Glenn Metz (counts four and five) and Danielle Metz (count five) were convicted of possession with intent to distribute cocaine.  Appellants Tolliver and Danielle Metz were convicted on one count of money laundering (count six).  Appellants Elwood and Helmstetter (counts nine, ten and eleven), and Arthur (counts seven, nine, ten and eleven) were convicted of committing murder and other violent crimes in aid of racketeering activity.  Finally, all Appellants, except Danielle Metz and Tolliver, were convicted of carrying and using a firearm in aid of drug trafficking.[2]

In this consolidated appeal, Appellants allege numerous errors at trial and other errors allegedly arising from their conviction and sentencing.  For the reasons set forth below, we

_____

[2]     Arthur (count thirteen), Glenn Metz (count fourteen), Helmstetter (count fifteen), Elwood (counts sixteen and seventeen), Sterling (counts twenty, twenty-one and twenty-two) and Moore (count twenty-two).

affirm in part, vacate in part, dismiss in part and remand in part for resentencing.

## I.  BACKGROUND

Appellants were charged in a twenty-two count indictment with various charges arising from a narcotics conspiracy based in New Orleans, Louisiana.  From 1985 to mid-1992, Appellants conspired to, and in fact did distribute approximately 1000 kilograms of cocaine in the New Orleans metropolitan area and, in furtherance of the conspiracy, committed murders, attempted murders and other violent crimes.  Appellant Glenn Metz, aided by his wife Danielle Metz, was the main organizer, supervisor and manager of a group of individuals known as the "Metz Organization."  The positions occupied by the other conspirators included, <u>inter alia</u>, "cocaine distributor" (Glenn Metz, Danielle Metz, Moore and Sterling); "payment collector;" "cocaine and cash courier" (Danielle Metz and Tolliver); "gunman and enforcer" (Arthur, Elwood and Helmstetter); and "firearms procurer and storer" (Glenn Metz, Arthur, Elwood, Helmstetter, Moore and Sterling).  Specific facts regarding the conspiracy will be enumerated as necessary to aid in our analysis.

## II.  PRE-TRIAL ISSUES

### A.  Motion to Suppress

Appellant Helmstetter asserts that his Fourth Amendment rights were violated when officers seized certain letters he sent to Appellant Elwood, and asks us to overturn the district court's denial of his motion to suppress.

3

### 1. Standard of Review

"We consider the evidence in the light most favorable to the prevailing party when we review the granting of a motion to suppress.  The district court's factual findings are accepted unless they are clearly erroneous.  Questions of law are reviewed de novo".  United States v. Richard, 994 F.2d 244, 247 (5th Cir. 1993).

### 2. Analysis

The district court found that Helmstetter lacked standing to challenge the search because seven of the eight letters were discovered and seized pursuant to a search warrant executed at Appellant Elwood's residence.  The court further found that Helmstetter was incarcerated at the time of the search and "made no showing that he had a legitimate expectation of privacy as to these letters that were taken from Elwood's residence."  The motion to suppress was denied as to the final letter because "that letter itself was the subject of a search warrant...and Defendant has made no showing that the warrant in question was defective in any way."

Helmstetter had no expectation of privacy once the letters were received by Elwood.  Appellant cites United States v. Pierce[3] and United States v. Koenig,[4] for the proposition that, as the sender of letters via United States mail, he had a

---

[3]   959 F.2d 1297, 1303 (5th Cir. 1992), cert. denied, 113 S.Ct. 621 (1992).

[4]   856 F.2d 843, 846 (7th Cir. 1988).

4

legitimate expectation of privacy in their contents.  Appellant,
however, ignores the fact that the letters were not in transit
when seized.  In fact, the letters had been received, opened and
presumably read by Elwood.  Helmstetter has failed to show that
he had any expectation of privacy once the letters left the
custody of the United States Post Office, and were received by
their intended recipient.[5]

## B.  Reciprocal Discovery and Abuse of Grand Jury Process

Appellant Arthur contends that the district court abused its
discretion by compelling him to engage in reciprocal discovery
with the government, and that, as a result, the government came
into possession of certain documents pertaining to his alibi
defense.  According to Arthur, the government was not entitled to
discover these documents because it failed to request notice of
any alibi defense in accordance with Fed. R. Crim. P. 12.1.
Arthur further contends the government used this information--
that allegedly substantiated an alibi to the government's
allegation that he participated in the crimes referred to as the
Earhart murders--to subpoena certain witnesses before the grand
jury, and thereby abused the grand jury process.

### 1.  Reciprocal Discovery

---

[5]     Cf. United States v. Jenkins, 46 F.3d 447, 456 (5th Cir.
1995)("[I]t was patently unreasonable for Appellees to have any
expectation of privacy vis-a-vis Boyd [the intended recipient of
the videotapes].  He had unlimited access to the videotapes,
absolute dominion and control over the videotapes and no direct
supervision, or indeed any fellow employees in the geographic
vicinity.").

"We review discovery rulings for abuse of discretion and will order a new trial only where a party demonstrates prejudice to his substantial rights."  United States v. Deisch, 20 F.3d 139, 154 (5th Cir. 1994).  Fed. R. Crim. P. 16(b)(1)(A) provides in relevant part,

> If the defendant requests disclosure under subdivision (a)(1)(C) or (D) of this rule, upon compliance by the government, the defendant, on request of the government, shall permit the government to inspect and copy or photograph books, papers, documents...which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

There is no dispute that Arthur requested and accepted discovery from the government under the initial indictment.  However, it is also plain that the government did not request reciprocal discovery until after the superseding indictment had been issued.  Arthur contends that, for Rule 16 purposes, a superseding indictment cuts off any right the government may have had to reciprocal discovery under the initial indictment.  Under this theory, because he did not request further discovery from the government under the superseding indictment, he had no obligation to provide the reciprocal discovery requested.  This appears to be a matter of first impression, but can be easily disposed.

Rule 16 provides no support for Arthur's contention.  In fact, Rule 16 creates a duty of continuing disclosure.  See Fed. R. Crim. P. 16(c).  The district court found that the government satisfied its burden by supplying all defense counsel with lists of tapes and exhibits...pursuant to both the original Indictment and the Superseding Indictment."  Appellant does not deny that he

6

accepted discovery from the government, and we see no reason to distinguish between the indictment and the superseding indictment for purposes of the reciprocal discovery requirement.

## 2. Abuse of Grand Jury Process

"The law is well settled in this circuit that while the Government may not use the grand jury in place of discovery for the purpose of preparing a pending indictment for trial, it may continue with an investigation." United States v. Ruppel, 666 F.2d 261, 268-69 (5th Cir. 1982), cert. denied, 458 U.S. 1107, 102 S.Ct. 3487 (1982). The grand jury process is entitled to a presumption of regularity which is not easily overcome. See e.g. Beverly v. United States, 468 F.2d 732, 743 (5th Cir. 1972). In the instant case, it is plain that there was no abuse of the grand jury process. As set out by the government, "it appeared that appellant Arthur intended to use documents from the Seattle Travelers Aid Society that appeared to have been fraudulently altered to support his alibi defense to the Earhart Expressway shootings...the grand jury was investigating whether the documents were false or had been altered, and, if so was endeavoring to determine the identities of the culpable persons."

Clearly, in a conspiracy of the size and scope of the one indicted herein, the grand jury could be expected to follow up on evidence which tended to implicate additional co-conspirators or indicate that additional crimes had occurred. Arthur has made no showing that the grand jury's inquiry was not part of a

7

legitimate investigation into a possible additional crime, nor has Arthur shown that he was prejudiced by the investigation.

Arthur was able to present his alibi defense at trial. In addition, the primary focus of the government's impeachment of his alibi--the alteration of the documents--was evident on the face of the documents, and therefore readily discoverable without grand jury process. The grand jury investigation only sought information on a putative crime which came to light during the discovery process, it was not used as a substitute for discovery. Arthur falls well short of the burden necessary to rebut the grand jury's presumption of regularity. The district court's ruling was not clearly erroneous.

## C.  Prejudice from Joint Trial

For the first time on appeal, Appellant Helmstetter contends that he was deprived of a fair trial because he was tried with the other defendants. The Federal Rules of Criminal Procedure require that "requests for a severance of charges or defendants under Rule 14" must be raised prior to trial. Fed. R. Crim. P. 12(b)(5). "Failure by a party to...make requests which must be made prior to trial...shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." Fed. R. Crim. P. 12(f).[6] Helmstetter has not shown _any_ cause for his

---

[6]     We note that some courts have conducted reviews for plain error where Rule 12(f) waiver has occurred. See United States v. Nuñez, 19 F.3d 719, 723 n. 10 (1st Cir. 1994). While we do not decide whether the language of Rule 12(f) mandates such a review, Helmstetter has failed to show "plain error" as that term is defined in this circuit. See United States v. Calverley, 37 F.3d 160 (5th Cir. 1994)(en banc).

failure to request a severance prior to trial, and therefore we need not address the merits of his argument.[7]

## D.  **Trial of Moore as an Adult**

Appellant Moore insists that the provisions of the Juvenile Delinquency Act[8] (JDA) deprived the district court of jurisdiction over him, or, in the alternative, that the district court failed to instruct the jury that conduct prior to Moore's eighteenth birthday could not be used to assess his guilt. Appellant failed to raise these issues below, so our review is for plain error.  See United States v. Calverley, 37 F.3d at 162. However, to the extent that Moore's contentions are jurisdictional, they may be raised at any time.  See, Fed. R. Crim. P. 12(b)(2).  Whether a defendant can be tried for a

---

[7]     Helmstetter relies on United States v. Washington, 550 F.2d 320, 328 (5th Cir. 1977), cert. denied, 434 U.S. 832, 98 S.Ct. 116 (1977), for the proposition that an appellant who fails to request a severance "either before or during the trial...must demonstrate actual prejudice resulting from the failure to sever his trial from that of his co-defendant."  Id. at 328.  Although Rule 14(f) was extant at the time Washington was decided, we neither mentioned, nor applied the plain language of the rule therein.  However, even if we were to address the merits of Helmstetter's claim under the Washington standard, he has failed to prove actual prejudice.  As stated in Washington, "[t]he law in this circuit is clear that `[a] defendant cannot claim prejudice from failure to sever merely because his likelihood of acquittal is not as great in a joint trial as in a separate trial.'"  Washington, 550 F.2d at 328.  If any prejudice resulted from the joint trial, it was ameliorated by the trial judge's instruction to the jury to assess the guilt of each defendant separately.  See  United States v. Bermea, 30 F.3d 1539, 1572 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1113 (1995)("Any prejudice created by a joint trial can generally be cured through careful jury instructions.").

[8]     18 U.S.C. §§ 5031-5042.

conspiracy which existed prior to his eighteenth birthday is a matter of first impression in this circuit.

The JDA requires the Attorney General to certify that "there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction," and that one of three factors is satisfied before proceeding against any juvenile[9] in federal court. 18 U.S.C. § 5032. This certification requirement is jurisdictional, and a juvenile may not be prosecuted in federal court absent certification. Id.; see also United States v. Wong, 40 F.3d 1347, 1363 (2nd Cir. 1994), cert. denied, 63 U.S.L.W. 3873 (1995). Moore became involved in the instant conspiracy before his eighteenth birthday,[10] but was indicted after his eighteenth birthday.[11] Moore contends that because the majority of his involvement in the conspiracy occurred before his eighteenth birthday, absent Attorney General certification the district court was without

_____

[9]     "Juvenile" is defined at 18 U.S.C. § 5031 as,

> [A] person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday, and "juvenile delinquency" is the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult or a violation by such a person of section 922(x).

[10]    Moore turned 18 on October 3, 1990.

[11]    Moore was originally indicted on August 7, 1992, the superseding indictment was returned on May 14, 1993.

10

subject matter jurisdiction over him.  Moore's assertion is unavailing.

Although the crime of conspiracy is "complete" at the moment the deal is struck, it is a continuing crime.

> It is well established that federal courts have jurisdiction over conspiracies begun while a defendant was a minor but completed after his eighteenth birthday.  "The [JDA] does not...prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor...."

United States v. Wong, 40 F.3d at 1365 (quoting United States v. Spoone, 741 F.2d 680, 687 (4th Cir. 1984)); United States v. Doerr, 886 F.2d 944, 969 (7th Cir. 1989)("[T]he protections of the Juvenile Delinquency Act are designed `to guarantee certain basic rights to juveniles who come within Federal jurisdiction.' Thus the protections of the Act are not applicable to a defendant...who is not a juvenile and has not committed an act of juvenile delinquency.").  However, for the defendant to be charged with a conspiracy that transcends his eighteenth birthday, he must do something to ratify his involvement in the conspiracy after he reaches the age of majority.  See United States v. Maddox, 944 F.2d 1223, 1233 (6th Cir. 1991), cert. denied, 502 U.S. 992, 112 S.Ct. 610 (1991),

> [A]n eighteen year-old who continues to participate in a conspiracy after his eighteenth birthday commits an act in violation of law after his birthday.  We do not believe, however, that a person who does absolutely nothing to further the conspiracy or to reaffirm membership in it after his eighteenth birthday can be held criminally liable as an adult in federal court.

11

The majority rule, that we now adopt, is that after he turns 18, a defendant may be tried for a conspiracy which temporally overlaps his eighteenth birthday--if the government can show that the defendant ratified his involvement in the conspiracy after reaching majority. We must determine whether there is sufficient evidence to show Moore's ratification of the conspiracy after his eighteenth birthday.

After conducting a thorough review of the record, we find that there was sufficient evidence for the jury to conclude Moore ratified his involvement in the conspiracy after his eighteenth birthday. The government adduced numerous post-October 3, 1990 transcripts of intercepted telephone conversations between Moore and several co-conspirators wherein Moore made obvious references to, and provided instructions regarding the sale of drugs and the handling of proceeds from drug crimes. Moore was also intercepted telling both Danielle and Glen Metz that he had been chased by several persons, and asked both of them to procure a firearm for his protection. In addition, during the August 9, 1992 execution of a search warrant at the apartment he shared with co-conspirator Sterling, a handgun, ammunition and a notebook containing records of drug transactions were found in his bedroom. Not only is the post-eighteenth birthday evidence sufficient to establish ratification of the conspiracy, but, standing alone, this evidence was sufficient for the jury to find Moore guilty of the Count I conspiracy.

The circuits are split on whether the district court must instruct the jury to disregard evidence of pre-eighteen conduct when assessing guilt.[12] However, because we find that the post-

[12]    Compare United States v. Maddox, 944 F.2d at 1233,

> [T]he government must make a threshold demonstration
> that the defendant who joined a conspiracy prior to his
> eighteenth birthday "ratified" his membership in that
> conspiracy after his eighteenth birthday.  He cannot be
> held liable for pre-eighteen conduct, but such conduct
> can, of course, be relevant to put post-eighteen
> actions in proper context.

and United States v. Spoone, 741 F.2d 680, 687 (4th Cir. 1984),
cert. denied, 496 U.S. 1162, 105 S.Ct. 917 (1985),

> The jury was entitled to assess this testimony in light
> of other evidence showing that Rusty had known of the
> auto theft scheme since its inception.  There is simply
> no basis to believe that the jury convicted Rusty of
> conspiracy solely because of his pre-eighteenth
> birthday activity, for the trial court repeatedly
> instructed the jury that it could not consider the
> juvenile acts as evidence of Rusty's guilt.

(citations omitted); with United States v. Wong, 40 F.3d at 1368,

> We conclude that the defendant's age at the time the
> substantive RICO or RICO conspiracy offense is
> completed is the relevant age for purposes of the JDA,
> and that an adult defendant may properly be held liable
> under RICO for predicate offenses committed as a
> juvenile.

and United States v. Doerr, 886 F.2d at 969-70,

> The district court did not err in refusing to give the
> requested instruction.  Contrary to Dale Doerr's
> assertion, the Fourth Circuit in Spoone did not
> explicitly "approve" an instruction of the type he
> requested.

M  M  M  M

> [O]nce it is established that certain acts of the
> charged offense occurred after the defendant's
> eighteenth birthday, it is appropriate for the entire
> case to be tried in adult court, in accordance with the

13

eighteenth birthday evidence was sufficient to support the jury's verdict, Moore cannot show that the omission of the jury instruction affected his substantial rights, and therefore cannot establish "plain error."[13]

## E.  Brady Material

Helmstetter argues that the government violated his rights under Brady by failing to disclose certain documents created by Detective Dennis Thornton of the Jefferson Parish Sheriff's Office (JPSO) in connection with his investigation of the Earhart Expressway shootings.  The district court, pursuant to a subpoena issued by another Appellant which the government subsequently moved to quash, examined the entire JPSO file, determined that there was not any Brady material therein, and concluded that "Defendant was not entitled these documents which were part of an on-going criminal investigation."

---

adult rules of procedure and evidence.  The court in Cruz therefore held that, once sufficient evidence has been introduced to allow a jury reasonably to conclude that a defendant's participation in a conspiracy continued after the defendant reached the age of eighteen, then the defendant may be tried as an adult. Moreover, at the adult trial, the government's introduction of evidence is to be limited only by the Federal Rules of Evidence.

(citations omitted); and United States v. Cruz, 805 F.2d 1464, 1476 (11th Cir. 1986), cert. denied, 481 U.S. 1006, 107 S.Ct. 1631 (1987)(same).

[13]    See United States v. Calverley, 37 F.3d at 164 ("Finally to be reviewable under this [plain error] standard an obvious legal error must affect substantial rights.  Olano counsels that in most cases the affecting of substantial rights requires that the error be prejudicial; it must affect the outcome of the proceeding.").

14

The Supreme Court has recently restated the standard for consideration of a Brady claim. See Kyles v. Whitley, 115 S.Ct. 1555 (1995).

> Bagley held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence bee disclosed to the defense, the result of the proceeding would have been different."

Id. at 1565.

> Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

Id. at 1566. Appellant need not show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict," nor is a harmless error analysis applicable once a Bagley error is found. Id. Finally, we are compelled to consider the suppressed evidence "collectively, not item-by-item." Id. at 1567.

We have reviewed the report that Helmstetter contends should have been disclosed, and, like the district court, find no Brady material therein. However, even if we were to find that the report tended to exculpate Helmstetter, the exculpatory evidence contained therein was of such an ineffectual nature that it cannot be considered "material" as that term is defined in Kyles v. Whitley. In terms of the Kyles analysis, we find the failure

15

to disclose the report in no way undermined confidence in the verdict.

### III.  JURY SELECTION

## A.  Voir Dire Regarding Pre-trial Publicity

Glenn Metz and Helmstetter claim that they were denied a fair trial because of "massive" pre-trial publicity, and that the district court failed to conduct adequate voir dire to ascertain whether the jury was truly fair and impartial.  We review under the standard of United States v. Chagra, 669 F.2d 241, 249-50 (5th Cir. 1982), cert. denied, 459 U.S. 846, overruled on other grounds, Garrett v. United States, 471 U.S. 773 (1985).  Neither Appellant presents evidence of actual prejudice attributable to the publicity so we need not address the first Chagra factor.  Only 21 of 86 prospective jurors had any knowledge of the case due to pre-trial publicity, and not one of the 21 actually served so the remaining Chagra factors are not satisfied.  The district court's voir dire was clearly adequate to insure an untainted jury.

## B.  Batson Challenge

Tolliver and Helmstetter, both of whom are black, contend that the government used six preemptory challenges to exclude five prospective black jurors and one black alternate for racially discriminatory reasons.

### 1.  Standard of Review

An allegation of racial discrimination contrary to the holding of <u>Batson v. Kentucky</u>[14] mandates a three stage inquiry.

> (1) The defendant establishes a prima facie case by raising an inference that the prosecution struck potential jurors solely because of race; (2) The burden then shifts to the prosecution to articulate legitimate, clear, and reasonably specific explanations for each of the challenged strikes. At this stage, the prosecution need only give a facially valid explanation; (3) At the third stage, the trial court determines whether the defendant has proven purposeful discrimination. The appellate court reviews this finding for clear error, giving great deference to the trial court's finding that the prosecutor's explanation was credible.

<u>United States v. Wallace</u>, 32 F.3d 921, 925 (5th Cir. 1994) (citations omitted).

**2. Analysis**

After jury selection, Appellant Danielle Metz, on behalf of all the defendants, raised the <u>Batson</u> issue by requesting that the court inquire into the government's reasons for exercising five of its twelve preemptory challenges to excuse black jurors. The government offered the following explanations: 1) The first venireman excused was "an older woman and appeared disinterested and was not paying attention....Because of her long term employment as school cafeteria worker we thought she might be overly sympathetic to young defendants;" 2) The second venireman was excused because of potential antagonism to the government stemming from a "convict[ion] of a simple battery about twenty-five years ago. He said at that time he was not treated fairly by the justice system;" 3) The third venireman

---

[14]    476 U.S. 79, 86, 106 S.Ct. 1712, 1717 (1986).

was excused because of employment with a cellular telephone company. "From experience [the government] felt that many of those businesses are dependent on drug dealers as customers....Those companies are often aware that these individuals are getting the phones, and payments are often made in cash and they continue to do business with them and even encourage that business;" 4) The fourth venireman was excused because "her brother was convicted of murder....We felt this would tend to make her more sympathetic to defendants who might be charged in those counts involving homicides and antagonistic toward the government." In addition, the juror had read several articles pertaining to the alleged crimes; 5) The fifth venireman excused "also appeared somewhat disinterested." In addition, "she lived on Cambronne Street which is the area where the government witness Lewis Gibbs resides. A lot of the activity of the Metz organization took place in this area. A number of individuals who reside there will come up during the course of the trial;" 6) The sixth venireman was excused because she "indicated that her sister had recently been arrested for narcotics charge [sic] and we felt this would make her antagonistic toward the government."

Each reason asserted by the government is a facially legitimate and non-discriminatory reason for excusing the referenced juror. Appellants made no further assertions of discrimination, and did not challenge any of the reasons stated by the government. There was no clear error.

18

## A. Exclusion of Pre-surgery Statements

### 1.  Statement of Wilfred Carr

Helmstetter and Arthur contend that they were denied their Sixth Amendment rights to compulsory process and confrontation by the exclusion of Wilfred Carr's pre-surgery statement.  Carr was shot during the Earhart expressway murders.  At the hospital, while waiting on a gurney outside the operating room, Carr was interviewed by JPSO Detective Dennis Thornton.  The transcript of the recorded interview sets forth, in relevant part,

```
Q:   And you drove from the Phoenix [Bar] down Earhart?
A:   Ah! huh (positive response)

Q:   What part of Earhart, did you get to Clearview yet?
A:   No, sir.

Q:   Okay you passed Hickory though, right?
A:   (inaudible)

Q:   What lane were you in Wilfred, you remember
A:   Ah! Ah! (negative response)

Q:   The bullets came through the door?
A:   Yea.

Q:   Did you see what kind of vehicle it was?
A:   No.

Q:   Did it come by slow?
A:   Fast.

Q:   Fast!  Was it speeding?
A:   Ah! huh (positive response)

Q:   Could you see if it was a car or a truck?
A:   I couldn't tell.

Q:   Can you think of anything else now Wilfred?
A:   Ah! Ah! (negative response)
```

Carr testified that he did not remember talking to anyone at the hospital the night of the shooting. He did, however, testify that after the shooting had stopped, he looked up and saw Helmstetter and Arthur, each armed with an AK-47, hanging out of the window of a black Ford Taurus station wagon. No attempt was made to impeach Carr with his prior statement.

During the Defendant's case, on direct examination of Detective Thornton, Helmstetter, without explanation or foundation, attempted to introduce the transcript of the Carr interview. The government lodged a hearsay objection to the introduction of the transcript on the ground that, due to Carr's medical condition, the statement lacked reliability. Helmstetter asserted that he was attempting to introduce the report to rebut Carr's testimony that he was not interviewed on the night of the shooting. The government offered to stipulate that Carr was interviewed by Detective Thornton on the night of the shooting, but the stipulation was rejected by defense counsel.[15]

Helmstetter and Arthur now assert four grounds upon which they contend the trial court should have admitted the statement. Appellants' assert that it constituted a "prior inconsistent statement" (Fed. R. Evid. 613); an "excited utterance," (Fed. R. Evid. 803(2)); "dying declaration," (Fed. R. Evid. 804(b)(2)) and that the district court acted inconsistently by admitting the

---

[15]    In fact, the court asked Detective Thornton, in the presence of the jury, whether he had interviewed Carr on the night of the shooting. Thornton responded affirmatively, and stated that he had interviewed Carr while he was awaiting surgery.

20

pre-surgery statement of Appellant Elwood, but excluding the pre-surgery statement of Carr.

### a. prior inconsistent statement

As we have stated previously,

> It is hornbook law that evidence of prior inconsistent statements of a witness may be admitted to impeach that witness. The prior statements may have been oral and unsworn, and "the making of the previous statements may be drawn out in cross-examination of the witness, or if on cross-examination the witness had denied making the statement, or has failed to remember it, the making of the statement may be proved by another witness."

United States v. Sisto, 534 F.2d 616, 622 (5th Cir. 1976). However, while Appellants might have been permitted to question Detective Thornton on whether he interviewed Carr on the night of the shooting, no foundation was laid during the cross-examination of Carr which would have permitted inquiry into the substance of the statement. Therefore, absent a hearsay exception, the substance of the statement was not admissible during the examination of Detective Thornton.

### b. hearsay exceptions

Appellants second and third reasons were never presented to the trial judge, and therefore can be reviewed only for plain error. On the basis of the record, the statement falls under neither the "excited utterance" nor "dying declaration"[16] exceptions to the hearsay rule.

### c. consistency between trial court's rulings

---

[16] The dying declaration exception is applicable where the witness is unable to testify, and therefore inapplicable to this case. See Fed. R. Evid. 804(b)(2).

Appellants' final argument is also easily disposed because Appellants have failed to show inconsistency in the district court's evidentiary rulings.  First, Elwood's statement, by definition, is an admission of a party opponent, and therefore not hearsay.  Fed. R. Evid. 801(d)(2).  Second, even if Elwood's statement could be considered hearsay, no objection was ever made to its admission.

### 2.  Ulyes White

Helmstetter also argues that the pre-surgery statement of Ulyes White, another victim of the Earhart Expressway shootings, was improperly excluded.  Appellant sought admission of the transcript of the recorded statement immediately prior to seeking admission of the Carr transcript.  The district court excluded the White transcript for the same reasons that the Carr transcript was excluded, and we affirm the district court on largely the same grounds.

Helmstetter asserts that the statement was admissible as either a dying declaration[17] or an excited utterance.  However, neither of these exceptions to the hearsay rule was voiced at trial, and, as a result, we have no foundation for determining whether the necessary requisites of either exception was met.  For example, we do not know the extent of White's wounds, and therefore do not know whether he spoke with belief of impending death.  See Fed. R. Evid. 804(b)(2).  In fact, the evidence

---

[17]    Unlike Carr, White died prior to trial of causes unrelated to the Earhart shootings, and was therefore unavailable.

22

suggests the contrary, because Carr testified that White was able to run for help after the shooting.  Neither do we know whether White was still under the "stress of excitement" caused by the shooting at the time of the interview.  See Fed. R. Evid. 803(2).

**B.  Mid-Trial Publicity**

Glenn Metz argues that the district court erred by denying a motion for mistrial based on mid-trial publicity.  A two-step inquiry is necessary to assess whether voir dire is necessary because of mid-trial publicity.

> A court must first look at that nature of the news material in question to determine whether it is innately prejudicial; factors such as the timing of the media coverage and its possible effects on legal defenses are to be considered.  Second, the court must ascertain the likelihood that the publicity has in fact reached the jury.  The prominence of the coverage and the nature and number of warnings against viewing the coverage become relevant at this stage of the inquiry.

United States v. Manzella, 782 F.2d 533, 542 (5th Cir. 1986), cert. denied, 476 U.S. 1123, 106 S.Ct. 1991 (1986)(citations omitted).  However, "[t]he trial judge has broad discretion in ruling on the issue of prejudice resulting from a jury's exposure to news articles concerning a trial."  United States v. Aragon, 962 F.2d 439, 443 (5th Cir. 1992).  "It is for the trial judge to decide at the threshold whether news accounts are actually prejudicial; whether the jurors were probably exposed to the publicity and whether jurors would be sufficiently influenced by bench instructions alone to disregard the publicity."  Gordon v. United States, 438 F.2d 858, 873 (5th Cir. 1971), cert. denied, 404 U.S. 828, 92 S.Ct. 139 (1971).

23

On the second day of trial, Appellant Arthur requested a mistrial on behalf of all defendants, due to television and newspaper coverage of the first day of trial. The district court denied the motion stating, "I am aware of what publicity there was on the case yesterday. I am aware what was in the paper this morning. I am aware what was on television....I am convinced that at this time there is no reason to grant a mistrial for there is no suggestion that the jury has been influenced by public publicity." No Appellant requested that the court conduct voir dire regarding the publicity.

The government contends, and Glen Metz does not dispute, that the publicity complained of was basically an accurate portrayal of opening argument and of the testimony at the first day of trial. Therefore, Appellant has failed to show that the publicity was "innately prejudicial." Second, unlike the authority relied upon by the Appellant, the district court herein strongly and consistently admonished the jury to avoid any press coverage of the trial.[18] After jury selection, the court admonished the jury,

> Now, during the course of the trial you will receive all the evidence you may properly consider to

---

[18]   Compare United States v. Herring, 568 F.2d 1099, 1104 (5th Cir. 1978)(Instruction cautioning jury to "not pay attention to anything outside the courtroom" inadequate to prevent prejudice) with United States v. Arzola-Amaya, 867 F.2d 1504, 1514 (5th Cir. 1989), cert. denied, 493 U.S. 933, 110 S.Ct. 322 (1989)(Instruction cautioning jury the "You are not permitted to read about it in the newspaper and you are not permitted to watch or listen to anything that is broadcast about the trial on television or radio" was "adequate safeguard[] to ensure that appellants received a fair trial free from prejudice.").

24

decide the case.  Don't attempt to gather any information on your own which you think might be helpful.  Don't engage in outside reading on the case. Don't attempt to visit any places mentioned in the case and don't in anyway try to learn about this case outside the courtroom.

Now that the trial has begun you must not read about it in the newspaper or watch or listen to television or radio reports about what is happening. The reasons for these rules, as I am certain you will understand, is that your decision in this case must be based solely on the evidence that is presented at trial.

After the first day of trial, the court admonished the jury,

I again remind you, also, most significantly that you refrain from watching any television news reports that might cover this trial and refrain from reading anything in the newspaper that might be written covering this trial.  As you recall when I told you yesterday that I am relying on you to more or less lock yourselves up at home, if you will, with regard to steering clear of any newspaper reports or news reports that might cover this trial and please have anyone who lives in your household with you make sure that they cooperate in that effort.

Appellant has failed to show that the trial publicity was "innately prejudicial," and that the admonishments by the trial judge were not appropriate to insure a fair and prejudice free trial.

## C.  Motion to Depose Witness

Arthur appeals the denial of his Federal Rule of Criminal Procedure 15(a) motion to depose an indispensable witness.  On the eighth day of trial, Arthur sought the court's permission to depose Earl Castain, a witness who would have allegedly corroborated Arthur's alibi defense to the Earhart shootings.[19]

---

[19]     As an initial matter, we doubt the importance of Castain's testimony.  Although Arthur asserts in his brief that Castain

According to Arthur, counsel had been attempting to locate Castain since the return of the superseding indictment. Castain was allegedly employed on a ship which, at the time of trial, was moored off the island of Diego Garcia, in the Indian Ocean. Arthur sought to take the deposition telephonically, after having the ship's master swear Castain. The district court denied Arthur's motion, stating in relevant part,

> Under the circumstances presented to the court in this matter, the court finds that "exceptional circumstances" within the meaning of Rule 15(a) of the Federal Rules of Criminal Procedure did not exist to justify the taking of Mr. Castain's deposition. Defendant Arthur's request to take Mr. Castain's deposition was untimely and, <u>it would have been difficult, if not impossible, within the available time constraints, for the Government to confirm the identification and reliability of the potential witness</u>. Further, the court was unaware of any person authorized to administer the requisite oath to Mr. Castain and the court on such short notice would not commission such a person due to lack of reliable and trustworthy indicia.

(emphasis supplied).

Rule 15(a) provides in relevant part,

---

would testify that he saw Arthur on an April 4, 1990 airline flight, in fact, the proffer only states that Castain would testify that

> He is a seaman by trade and once in 1990 when he was flying from New Orleans to Seoul, Korea to pick up a ship...he recalls Arthur on the same flight. Arthur did not travel to Korea, but Castain is not sure where he last saw him.

Notable is what the proffer does not include. It does not specify that Castain would testify to the April 4th date, and it does not specify that Castain saw Arthur travel all the way to Seattle, Washington. In fact, the airline tickets offered by Arthur reflect that Castain and "Willis Mitchell"-- according to Arthur he flew under an alibi--departed New Orleans to Memphis, Tennessee.

26

> Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition.

"The word `may' signifies that the district court retains broad discretion in granting a Rule 15(a) motion and that the court should review these motions on a case-by-case basis, examining whether the particular characteristics of each case constitute `exceptional circumstances.'" United States v. Dillman, 15 F.3d 384, 389 (5th Cir. 1994), cert. denied, 115 S.Ct. 183 (1994). "The district court decides when `exceptional circumstances' exist, subject to appellate review for abuse of discretion." United States v. Aggarwal, 17 F.3d 737, 741-42 (5th Cir. 1994).

We find that the district court was well within its discretion in determining that exceptional circumstances did not exist. As discussed at footnote 19 above, Castain's testimony was of questionable value to the defense case. Further, there is no showing that, had the deposition been taken, it would have been admissible at trial. See Fed. R. Crim. P. 15(d) and Fed. R. Evid. 804(a)(5). Finally, the reliability of the telephonic method of deposition in this matter was of serious concern. As stated by the district court, there was no way for the government to verify the identification and reliability of the deponent.

We have located only one reported case discussing the use of a telephonic deposition--without any parties' attorneys being on-site with the deponent--in a criminal case. See United States v. Ferrera, 746 F.2d 908, 913 (1st Cir. 1984) In that case, the

27

denial of the request for telephonic deposition was affirmed. We do not believe that Arthur has provided a "strong showing of the necessity of such a procedure,"[20] nor has he shown that an "exceptional circumstance" or "the interests of justice" mandated the taking of the deposition.

## D. Judicial Misconduct

Glenn Metz contends that his conviction should be reversed because the district court failed to remain fair and impartial while conducting the trial. Specifically, Metz contends first that the district court conducted an "ex parte conference" with the prosecutors, and received "unidentified papers, ex parte, and sua sponte." Second, Metz contends that the district court "refused to rule on [Elwood, Tolliver and Lawrence's double jeopardy motions] until after the completion of the trial, for the sole purpose of permitting the prosecution to illegally display the 52 kilos of cocaine to the jury." Third, that the trial court "displayed a highly unprofessional and partial lack of tolerance towards members of the defense."

### 1. Standard of Review

Our standard of review to determine whether alleged judicial conduct prejudiced an appellant's right to a fair trial is well settled. See United States v. Williams, 809 F.2d 1072, 1086 (5th Cir. 1987), cert. denied, 484 U.S. 896, 108 S.Ct. 228 (1987),

---

[20] For example, although we recognize that Castain was beyond the subpoena power of the court, there was no showing that Castain would not voluntarily return to testify at the trial, nor did Appellant explain why a more traditional deposition could not have been conducted.

28

In reviewing these [judicial misconduct] claims, we are necessarily limited to the cold black and white of the transcripts. The life of the trial, in which gestures and intonations breathe more subtle meanings into the transcribed words, cannot be presented and escapes us. We must therefore scrutinize the record all the more carefully. The Second Circuit has described the task before us:

> Our role, however, is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the appellants] a fair, as opposed to a perfect, trial.

(quoting United States v. Pisani, 773 F.2d 397, 402 (2nd Cir. 1985)); see also, United States v. Bermea, 30 F.3d at 1569,

> To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor. The judge's intervention in the proceedings must be quantitatively and qualitatively substantial to meet this test.

(citations omitted).

### 2.  **Ex Parte Conference and Documents**

Appellant has failed to point us to _any_ portion of the record indicating that the court conducted ex parte communications with the prosecutors or improperly accepted ex parte documents.[21]

### 3.  **Double Jeopardy Motion**

Metz next argues that the district court favored the prosecution by withholding his ruling on Elwood, Tolliver and

---

[21]  We know from the record that the district court conducted in camera reviews of some documents, however, the court's discretion to conduct such inspections is well settled.

Lawrence's double jeopardy motions until after trial to deprive them of the opportunity to appeal an adverse double jeopardy ruling as permitted under <u>Abney v. United States</u>, 431 U.S. 651 (1977). However, the record makes clear that the double jeopardy motions of Tolliver and Lawrence were not filed until <u>after</u> trial began, and that the Elwood's motion was, in fact, denied <u>prior</u> to trial. Metz's argument is without foundation.

### 4. Trial Judge's Treatment of Defense Counsel and Witness

Finally, Metz complains that the trial judge's treatment of a defense witness and defense counsel deprived him of a fair trial. We initially note that none of the incidents cited by Metz involved his attorney or witnesses. We also note that district judges can exercise broad discretion in maintaining the pace and objectivity of the trial. <u>See</u> <u>e.g.</u> <u>United States v. Wallace</u>, 32 F.3d at 928,

> A federal district judge may comment on the evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting time limits on counsel. "Improper" comments by a trial judge do not entitle the defendant to a new trial unless the comments are error that is substantial and prejudicial to the defendant's case.

(citations omitted).

Specifically, Metz complains that the district judge irrevocably impinged on the fairness of the trial when he asked the mother of one of the defendants--who was allowed to stay in the courtroom after her testimony was completed--to leave the courtroom during the questioning of her daughter, who was called as a subsequent defense witness. Apparently, the judge noticed

30

that the spectator appeared to be signaling answers to her daughter.[22]  While we fail to see how exclusion of a spectator who is prompting another witness could rise to the level of constitutional error, we find that the district court's subsequent cautionary instruction alleviated any possible error that had occurred.[23]

Metz also complains of the district court's alleged "abuse" of defense counsel.  We have reviewed those portions of the transcript cited by Appellant, and conclude that the district judge's conduct was well within constitutional boundaries, and in no way affected Metz's right to a fair trial.    In addition, if any error occurred as a result of the district judge's conduct vis-a-vis defense counsel, it was ameliorated by the jury

---

[22]    The judge stated,

> Excuse me.  Now Mrs. Elwood, you may be doing it unconsciously, ma'am, but you're signaling answers by nodding your head up and down and side to side.  Yes, ma'am, you.  And so I am going to ask you to please leave the courtroom for the rest of the testimony.

[23]    After a break, the judge instructed the jury,

> Ladies and gentlemen, you will recall before the break I asked defendant Elwood's mother to leave the courtroom because, as I mentioned, I thought she was signaling her head in negative and affirmative responses or shaking her head.  As I mentioned when I asked her to leave, it might have been done subconsciously, which many people may do on hearing a question and having a tendency to indicate an answer...She has been invited to come back into the courtroom now, if she chooses to.  Because it may have been a subconscious thing.  I ask you not let my admonition to ask her to leave the courtroom to affect the credibility of the witness in this case.

instruction[24] that delineated his proper role in the proceedings.[25]

## E.  Improper Jury Instruction on Murder

Helmstetter complains that the district court violated his due process rights by improperly instructing the jury regarding the murder count.  Helmstetter failed to voice this objection at trial, and therefore our review is for plain error.  See United States v. Parziale, 947 F.2d 123, 129 (5th Cir. 1991), cert. denied, 503 U.S. 946, 112 S.Ct. 1499 (1992),

> Although Fed. R. Crim. P. 30 provides that a defendant waives his right to appeal the lack of a limiting instruction if he failed to request such an instruction when the testimony was admitted or when the court charged the jury, Fed. R. Crim. P. 52(b) provides th[at] "[p]lain errors or defects affecting substantial rights may be noticed [on appeal] although they were not brought to the attention of the trial court."  Thus, by combining Rules 30 and 52 of the Federal Rules of Criminal Procedure, the courts have created a plain error standard of review....

While Helmstetter's brief is far from specific, it appears that he is contending that the district court should have instructed the jury on the elements of murder under Louisiana law rather than allowing the jury to apply a generic definition of murder.  There does not appear to be any dispute that the district court

---

[24]  In relevant part, the judge instructed the jury,

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

[25]  See United States v. Bermea, 30 F.3d at 1571-72.

32

properly instructed the jury on the elements of 18 U.S.C. § 1959,[26] the crime for which he was indicted.

To win reversal under the plain error standard, Appellant must show not only that a "plain" error occurred, but must also show that the error "affected his substantial rights." United States v. Calverley, 37 F.3d at 162. "[I]n most cases the affecting of substantial rights requires that the error be prejudicial; it must affect the outcome of the proceeding." Id. at 164.

In the first instance, no plain error occurred because federal courts typically require only a "generic" definition of the underlying state crime in a RICO charge. See United States v. Orena, 32 F.3d 704, 714 (2nd Cir. 1994); United States v. Bagaric, 706 F.2d 42, 62 (2nd Cir. 1983), cert. denied, 464 U.S. 840, 104 S.Ct. 133 (1983). Second, no Appellant ever contended that the Earhart Expressway shootings did not constitute murder,

---

[26]     Title 18 United States Code section 1959 provides, in relevant part,

    Whoever...for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires to do so, shall be punished--

        (1) for murder, by death or life imprisonment, or a find under this title or both....

therefore the district judge had no reason to believe that the definition of the underlying state crime was at issue.

Finally, even if we were to find that the district court had committed plain error by failing to set out the elements of murder, in no way were the Appellant's substantial rights affected. When two persons die while riding in a vehicle that is shot over 150 times with automatic weapons, any conceivable definition or element of murder has been satisfied. An enumeration of the elements of the crime could have in no way have affected the verdict.

## V. DOUBLE JEOPARDY

Appellant Elwood argues that the district court improperly denied his pre- and post-trial motions to dismiss count one of the indictment on double jeopardy grounds.

### A. Background

Elwood argued that the count one conspiracy was the same offense for which he had been previously convicted--along with co-defendants William Barnes, Jr. and Ernest Marrero--of conspiracy with intent to distribute cocaine, possession with intent to distribute cocaine, and using and carrying firearms in relation to a drug trafficking offense.[27] The government does not dispute that certain of the overt acts referred to in the

---

[27] We affirmed Elwood's prior conspiracy conviction in <u>United States v. Elwood</u>, 993 F.2d 1146 (5th Cir. 1993) (<u>Elwood I</u>).

superseding indictment were also overt acts in the Elwood I conspiracy.[28]

The district court denied Elwood's pre-trial motion to dismiss on two bases. First, under the five factor test we set out in United States v. Marable, 578 F.2d 151, 154 (5th Cir. 1978),[29] the district court found that the conspiracies were separate. Second, the court found that even if the conspiracies were not separate, the double jeopardy exception in Brown v. Ohio,[30] was applicable. The district court denied Elwood's post-trial motion to dismiss and motion for a new trial on the basis that, after having heard all of the evidence, the conspiracies were clearly separate.

## B. Standard of Review

---

[28] E.g., the superseding indictment states,

On or about July 12, 1991, a LaPlace, Louisiana, defendant GLENN METZ and GERALD ELWOOD, among others, possessed approximately two (2) kilograms of cocaine.

[29] Our examination of the record focuses upon these elements: (1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

United States v. Marable, 578 F.2d at 154.

[30] 432 U.S. 161, 169 n. 7, 97 S.Ct. 2221, 2227 n.7 (1977).

35

Double jeopardy issues are questions of law, thus our review is plenary.[31]  As we have set out previously,

> The Supreme Court described the initial test for determining whether two offenses are the same for double jeopardy purposes in Blockburger v. United States.  We ask "whether the offense charged in the subsequent prosecution `requires proof of a fact which the other does not.'"  If "application of [Blockburger] reveals that the offenses have identical statutory elements or that one is a lesser offense of the other...the subsequent prosecution is barred."  As recognized by the Supreme Court, however, Blockburger does not constitute  the entire double jeopardy inquiry in the context of successive prosecutions.  We also must test the second prosecution to determine whether it is barred under one of the narrowly defined exceptions....

United States v. Deshaw, 974 F.2d 667, 670 (5th Cir. 1992) (footnotes omitted).  Appellant carries the initial burden of showing that he has been subjected to double jeopardy.  See id.

Once the Appellant successfully establishes his prima facie claim, the burden shifts to the government to show by a preponderance of the evidence that the indictment charges a crime separate from the charge for which he was previously placed in jeopardy.  Id.  The government may instead elect to show that the subsequently indicted conduct falls into one of the narrowly circumscribed exceptions to the double jeopardy bar.

## C.  Analysis

There is no question that Elwood has established a prima facie claim of double jeopardy.  The Elwood I conspiracy took place within the same time frame as the instant conspiracy (Metz

---

[31]    See, e.g., United States v. Gonzales, 40 F.3d 735, 737 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1716 (1995).

36

conspiracy), involved common participants--albeit in <u>Elwood I</u> the common characters appeared as unindicted co-conspirators, not co-defendants--overt acts from the <u>Elwood I</u> conspiracy were listed as overt acts of the Metz conspiracy and the statutory offenses are identical.  While the government attempts to distinguish the conspiracies on the basis of the <u>Marable</u> factors, it seems plain to us that the <u>Elwood I</u> conspiracy is simply a small part of the larger Metz conspiracy, and is therefore indistinguishable for double jeopardy purposes.  <u>See</u> <u>United States v. Deshaw</u>, 974 F.2d at 673-75.  We do find, however, that the so-called "due diligence" exception set forth in <u>Brown v. Ohio</u> is applicable.

In <u>Brown v. Ohio</u>, the Supreme Court stated,

An exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence.

432 U.S. at 169 n.7, 97 S.Ct. at 2227 n.7.  Whether the <u>Brown</u> exception can be utilized to avoid double jeopardy estoppel of subsequent conspiracy prosecutions is a matter of first impression in this Circuit.  We begin by addressing the parameters of the exception.

As stated by the Supreme Court,

The rule established in <u>Brown</u>[<u>v. Ohio</u>], however, does have some exceptions.  One commonly recognized exception is where all the events necessary to the greater crime have not taken place at the time the prosecution for the lesser is begun.  This exception may also apply when the facts necessary to the greater were not discovered despite the exercise of due diligence before the first trial.

37

Jeffers v. United States, 432 U.S. 137, 151-52, 97 S.Ct. 2207, 2216-17 (1977). The Brown exception can be applied in two ways. First, double jeopardy does not apply where the greater crime was incomplete at the time the lesser charge was prosecuted. This was, in fact, the situation faced by the Supreme Court in Diaz v. United States.[32] Therein, the Court determined that Diaz could be prosecuted for murder, despite his previous conviction for assault and battery of the same victim, because the victim had not died--and therefore the crime of murder had not been committed--at the time of the assault and battery prosecution. Under the second application of the exception, a person prosecuted for a lesser included offense may be subsequently prosecuted for the greater offense if the government, despite the exercise of due diligence, did not have sufficient facts to establish the greater crime.

This case does not present a classic Diaz v. United States situation where Elwood was tried for a lesser included offense because the greater offense was not yet complete. While the conspiracy continued beyond Appellant's arrest in Elwood I, he has remained in custody since his initial arrest. Application of the first exception in this situation would, in essence, allow the exception to consume the rule. For double jeopardy purposes, and specifically for purposes of the Brown exception, Elwood's

---

[32]    223 U.S. 442, 32 S.Ct. 250 (1912).

participation in the conspiracy ceased at the time of his arrest.[33]

However, the second prong of the Brown exception is applicable.[34]  From the record, it is apparent that while the government may have suspected the existence of the Metz conspiracy during the prosecution of Elwood I, at that time the government did not have sufficient evidence to indict Elwood for his participation in the Metz conspiracy.  We must balance this factor with the relevant double jeopardy policies to determine whether the Brown exception is applicable.

As set out by the Ninth Circuit,

> Two policies served by the Double Jeopardy Clause are relevant [to the application of the due diligence exception]:  prevention of multiple punishments for one offense, and protection from harassment and from the physical, psychological, and financial burdens of multiple prosecutions.  We must balance against them the societal interest in imposing just punishment on the guilty.

United States v. Stearns, 707 F.2d 391, 393 (9th Cir. 1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720 (1984).  We are

---

[33]  Cf. Garrett v. United States, 471 U.S. 773, 105 S.Ct. 2407 (1985)(Evidence was consistent with the jury's finding that the CCE continued beyond the time of initial conviction because defendant was arrested for drug trafficking while out on bail pending sentencing for prior conviction).

[34]  The Supreme Court has "caution[ed] against ready transposition of the "lesser included offense" principles of double jeopardy from the classically simple situation presented in Brown to the multilayered conduct, both as to time and to place, involved in this case."  Garrett v. United States, 471 U.S. at 789, 105 S.Ct. at 2416.  However, as noted above, the Elwood I conspiracy was a lesser conspiracy, wholly subsumed within the greater Metz conspiracy.  Therefore, we find the Brown "lesser included offense" situation analogous to the present case.

39

convinced that these concerns can be eliminated through the

narrow application of the exception.[35]

The government plainly could not prove Elwood's involvement

in the Metz conspiracy at the time of Elwood I.  As summed up by

the government in its brief,

> [A]t the time of his December 1991 trial in Elwood I,
> the government was...unaware of key evidence connecting
> him to the acts of violence committed in furtherance of
> the instant conspiracy.  For example, Wilfred Carr, the
> sole surviving witness to the Earhart Expressway
> shootings, did not cooperate with the government until
> shortly before July 1992.  Carr thereafter gave key
> information linking the vehicle used in that incident
> with Appellant Elwood.  Moreover, Elwood's admissions
> to Fennidy about the Earhart Expressway shootings were
> not made until after July 1992, i.e., after the two
> become fellow inmates at a federal facility, and Dwayne
> Sandifer did not inform the government about Elwood's
> admissions to him until after Sandifer entered into his
> agreement with the government in March 1992.  Thus the
> government could not have proven Elwood's guilt beyond
> a reasonable doubt without the evidence it obtained
> after the Elwood I trial.

Thus, while the government may have suspected that Elwood was

part of the Metz conspiracy, it was not until later that evidence

showing his involvement came to light.  What appeared on the

surface to be a discrete drug transaction--based on the facts

reasonably available to the government at the time--turned out to

be part of a much larger conspiracy.[36]  And Elwood, whose initial

---

[35]    Although the sentencing guidelines do not factor into our
double jeopardy analysis, much of the prejudice resulting from
the initial prosecution can be eliminated through proper
application of the sentencing guidelines.

[36]    Cf. United States v. Rosenberg, 888 F.2d 1406, 1415 (D.C.
Cir. 1989)("On remand, the government must be given an
opportunity to argue for the existence of this "due diligence"
exception and to demonstrate that, despite the exercise of due
diligence, it did not discover evidence linking the conspiracy to

40

role appeared small, turned out to be a major character in the overall scheme.[37]

It is elementary that the government cannot prosecute on mere suspicion.  While Elwood contends that the government knew of the existence of the Metz conspiracy by the time of the Elwood I trial, he nowhere contends that the government had sufficient evidence to indict him for the Metz conspiracy.[38]  As the Court stated in Brown, an exception may apply where "the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence".  In this case, the evidence necessary to sustain the charge was not discovered until after the Elwood I prosecution.  In fact, much of Elwood's most egregious conduct--e.g., his role in the Earhart

---

the Washington bombings until after Rosenberg and Blunk had been convicted in the New Jersey trial.").

[37]   We emphasize that the exception applied in this case is very narrow in scope.  If the government suspected Elwood's involvement in a larger conspiracy, the far better course would have been to indict him only on the substantive offense, and later, when the facts were fully developed, indict him on the broad conspiracy.  See e.g. United States v. Felix, 503 U.S. 378, ___, 112 S.Ct. 1377, 1385 (1992) ("[A] substantive crime, and a conspiracy to commit that crime, are not the `same offense' for double jeopardy purposes."); Garrett v. United States, 471 U.S. 773, 105 S.Ct. 2407 (1985) (Separate punishments permitted for underlying predicate offenses and CCE offense).

[38]   The search warrants referenced by Elwood clearly demonstrate that the government suspected the existence of the Metz conspiracy and Elwood's involvement with the conspiracy.  However, Elwood's reference to the warrants merely begs the question whether the government could "sustain an indictment" on the charge.  Because assertions in a search warrant are made on the basis of "probable cause," and not "beyond a reasonable doubt," they are only useful as evidence of the government's "knowledge" (based on probable cause), not its ability to prove the charge.

Expressway murders--was not even _suspected_ at the time of the initial prosecution.

## VI. CONSPIRACY[39]

In a conspiracy prosecution, the government must prove beyond a reasonable doubt:  (1) that an agreement  to violate the narcotics laws existed between two or more persons, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy.  _United States v. Magee_, 821 F.2d 234, 238-39 (5th Cir. 1987).  Proof of any element may be by circumstantial evidence, and "a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'"  _United States v. Marx_, 635 F.2d 436, 439 (5th Cir. Unit B 1981) (quoting _United States v. Malatesta_, 590 F.2d 1379, 1381 (5th Cir.) (en banc), _cert. denied_, 440 U.S. 962 (1979). Reviewing the role played by each of the appellants in this "collocation," we uphold the convictions.

---

[39]   Sections VI through XI address sufficiency of the evidence on various statutory offenses.  We apply the same standard of review to each offense:  Convictions must be affirmed if the evidence, viewed in the light most favorable to the verdict, with all reasonable inferences and credibility choices made in support of it, is such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. _Jackson v. Virginia_, 443 U.S. 307, 319 (1979); _United States v. Kim_, 884 F.2d 189, 192 (5th Cir. 1989).  In making this determination, we need not exclude every reasonable hypothesis of innocence.  _United States v. Henry_, 849 F.2d 1534, 1536 (5th Cir. 1988).  Juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence.  _United States v. Cruz-Valdez_, 773 F.2d 1541, 1546-47 (11th Cir. 1985) (en banc), _cert. denied_, 475 U.S. 1049, 106 S.Ct. 1272 (1986).

## A. Danielle Metz

Danielle Metz raises two arguments regarding the sufficiency of the government's evidence against her on count one of the indictment. First, she asserts that the Government's evidence was insufficient to sustain her conviction. Second, as a corollary of the same argument, she asserts that her testimony should be credited over the testimony of the government's witnesses because many of them were testifying pursuant to plea agreements. We address these issues in reverse order.

Danielle Metz asserts that the Government's evidence failed to controvert her trial testimony that she was not involved in the drug conspiracy. This argument is apparently premised on the claim that the government witnesses were not credible, and therefore the jury should have credited her testimony. It is a fundamental axiom of appellate review that matters of credibility are for the jury. "Only when testimony is so unbelievable on its fact that it defies physical laws should the court intervene and declare it incredible as a matter of law." United States v. Lerma, 657 F.2d 786, 789 (5th Cir. 1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1279 (1982). The fact that the majority of the witnesses against Appellant testified pursuant to plea agreements does not affect this maxim. Although the jury can take plea agreements into account when assessing credibility; the credibility of cooperating witnesses remains an issue for the jury. See United States v. Puma, 937 F.2d 151, 155 (5th Cir. 1991), 502 U.S. 1092, 112 S.Ct. 1165 (1992).

43

Danielle Metz does not make any specific allegations with regard to the sufficiency of the evidence against her, but argues generally that the evidence was insufficient to sustain her conspiracy conviction. We have reviewed the record, and agree with the synopsis of the evidence contained in the government's brief.

> Overwhelming evidence clearly demonstrated that appellant Danielle Metz was a prime force, and not just a passive presence, in the acquisition and distribution of large quantities of cocaine by the Metz organization....Angela Bernard testified from 1987 to 1991, she periodically received cocaine from Danielle Metz and sold it at the direction of Danielle Metz and gave her the payments collected for this cocaine. Furthermore, Bernard and Danielle Metz made at least five trips to Houston to obtain 40 kilogram loads of cocaine on each trip for distribution in the New Orleans area.
>
> Rigoberto Rincon testified that he delivered 40 kilograms of cocaine to Danielle Metz at her Slidell residence and received payment of $350,000 to $400,000 in cash from her. Rincon also consulted with Danielle Metz about arrangements for delivery of cocaine to Metz organization employees in Miami.
>
> Moreover, Oliver Myles, Dwayne Sandifer, and Miranda Roebuck testified that Danielle Metz was their contact for receipt of the delivery of hundreds of kilograms of cocaine from the Metz organization, the last quantity for Myles and group being a five kilogram delivery of cocaine directly from Danielle Metz between late July and August 16, 1991.

The record is replete with evidence proving that a conspiracy existed. We are left to determine whether the evidence showed that Danielle Metz knew of the conspiracy, intended to join and, in fact, participated in the conspiracy. Our review of the record indicates that sufficient evidence was presented, regarding Appellant's conduct, to show her complicity and participation in

44

the scheme.  See <u>United States v. Marx</u>, 635 F.2d at 439 ("assent to a conspiracy may be inferred from acts which furthered the purpose of the conspiracy."); <u>see</u> <u>also</u> <u>United States v. Middlebrooks</u>, 618 F.2d 273, 278 (5th Cir.), <u>cert. denied</u>, 449 U.S. 984 (1980).  We do not find any reason to disturb the jury's decision to credit the testimony of the government's witnesses over that of Danielle Metz.

## B.  Sterling

Sterling also contends that the government failed to present sufficient evidence to convict him on the conspiracy charge. Appellant does not deny the existence of a conspiracy, but contends that he was simply a "small time" drug dealer, and that the government failed to produce sufficient evidence to show his participation in the Metz conspiracy.  As we have stated previously,

> One may be guilty as a co-conspirator even if he or she plays only a minor role, and that person need not know all the details of the unlawful enterprise or know of the exact number or identity of all the co-conspirators, so long as in some fashion he or she knowingly participates in the larger conspiratorial objectives.

<u>United States v. Greenwood</u>, 974 F.2d 1449, 1457 (5th Cir. 1992), <u>cert. denied</u>, ___ U.S. ___, 113 S.Ct. 2354 (1993) (citations omitted).

45

While the evidence is circumstantial,[40] there was sufficient evidence to link Sterling to the conspiracy. A government witness testified that Sterling was dealing drugs with Moore or getting drugs from Moore, and that the witness had "fronted" the pair drugs in the past. In addition, numerous intercepted telephone conversations indicated that Sterling was actively involved in the conspiracy.

On one occasion, Sterling and Moore were intercepted discussing "fronting" a quantity of drugs to a person named "Fat." On another occasion, Sterling and Moore were intercepted discussing cash proceeds from drug transactions. Sterling and an unknown male were also intercepted discussing money and drugs.

During a period of surveillance of Sterling, Moore was intercepted expressing his concern to Sterling and another individual that Sterling might be arrested while carrying drug proceeds. Finally, Sterling was present at Moore's apartment when a search warrant was executed and agents seized numerous firearms, beepers, cellular phones and drug records. The record indicates

---

[40]    See United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988),

> [P]roof of "mere knowing presence" is not sufficient to convict a person of participation in a conspiracy. Although each element of the conspiracy charge must be proved beyond a reasonable doubt, no element need by proved by direct evidence, but may be inferred from circumstantial evidence. An agreement may be inferred from "concert of action." Voluntary participation may be inferred from "a collocation of circumstances." Knowledge may be inferred from "surrounding circumstances."

(citations omitted).

that Sterling was the owner of at least one of the firearms, a beeper and a cellular phone.[41]

Based on the foregoing, the jury could reasonably find that Sterling was a participant in the Metz conspiracy. There is no question that he had a close association with Moore, and the testimony of the government witness, in conjunction with the intercepted telephone conversations, indicate that Sterling was not simply a "small time" dealer, but rather he was an active member of the conspiracy.

## C. Marlo Helmstetter

Finally, Helmstetter summarily contends that the evidence was insufficient to convict him of the count I conspiracy. The record makes clear that the government presented sufficient evidence for a reasonable jury to determine that he was a member of the conspiracy. As discussed above, the record is manifest with evidence showing that a conspiracy existed, the only question is whether the government presented sufficient evidence to show that Helmstetter was involved. It does.

The record shows that Helmstetter acted in concert with Arthur and Elwood to kill Michael Wilson[42] and to attempt to kill Lester

---

[41]    While "mere presence" is insufficient to show connection to a conspiracy, presence can be coupled with other factors to demonstrate participation.

[42]    Elwood was positively identified by Wilfred Carr as one of the shooters in the Earhart Expressway murders in which Michael Wilson was killed.

47

Duplessis.[43]  These events were tied to an on-going "war" between the Metz conspiracy and a rival drug organization.  Helmstetter's ties to the conspiracy were also revealed through a series of letters, written to Elwood, while Helmstetter was in jail (See Section II.A. supra).  Therein, Helmstetter discussed his desire to reassociate with Elwood and Arthur to take care of their "business," and to get back in the "game."[44]  He asked Elwood to have his gun ready for him when he was  released.  He also made numerous references to he, Elwood and Arthur revenging the killing of a mutual friend.

In addition, shortly before Helmstetter was released from prison, Elwood wrote a letter to him that, inter alia, provided advice on his return to society, advised him not to deal in "crack," told him to not to keep guns with drugs and advised Helmstetter that he had spoken with Moore about picking him up from jail.

### VII.  CCE

Danielle Metz next contests the sufficiency of the evidence to sustain her conviction for engaging in a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848.  To show a violation of the CCE statute, the government must prove that

---

[43]   A witness testified that he saw Helmstetter, among others, riding in a black station wagon, carrying an AK-47.  The witness testified that he saw the station wagon pass, heard gun shots and then saw Helmstetter flee in the station wagon.  Duplessis, who was compelled to testify, stated that the shooters exited from a black station wagon.

[44]   A government witness testified that "game" was a euphemism for the drug trade.

Appellant organized, supervised or managed five or more persons in a continuing series of drug violations from which she obtained substantial income.  See id.; United States v. Gonzales, 866 F.2d 781 (5th Cir. 1989), cert. denied, 490 U.S. 1093, 95 S.Ct. 2438 (1989).

First, Danielle Metz argues that the government failed to show that she received "substantial income" from the drug enterprise. She bases this argument on the fact that the government failed to show that she made significant purchases during the relevant period.

Second, Appellant contends that the evidence was insufficient to show that she occupied the position of organizer, supervisor or manager.  Danielle Metz bases this assertion on the fact that she did not know where to obtain a weapon for Moore, did not know where funds were kept and because she was not readily accessible when potential customers attempted to contact her.

Finally, Appellant argues that the government failed to show that she was the organizer, supervisor or manager of five or more persons.  While Appellant appears to concede that she was involved with at least three persons, she also contends that the government failed to carry its burden of showing that she actually organized, supervised or managed those persons.

## A.  Substantial Income

"[T]he requirement that a defendant obtain substantial income from drug trafficking is satisfied by showing that many thousands of dollars changed hands, and that some was received by the

49

defendant." <u>United States v. Gonzales</u>, 866 F.2d at 784.  Evidence showing that Appellant had the resources to engage in large scale narcotics transactions in sufficient to meet this requirement.  <u>See e.g.</u> <u>United States v. Church</u>, 955 F.2d 688, 697 (11th Cir. 1992), <u>cert. denied</u>, ___ U.S. ___, 113 S.Ct. 233 (1992)("This court has held that `evidence that large amounts of cocaine and tens of thousands of dollars passed through the operation' satisfies this element.");  <u>United States v. Webster</u>, 639 F.2d 174, 182 (4th Cir. 1981), <u>cert. denied</u>, 454 U.S. 857, 102 S.Ct. 307 (1981)("[G]iven the quantity of drugs which were shown to have been moving in and out of Webster's possession, the jury would have been justified in concluding that he had received tens of thousands or even hundreds of thousands of dollars from his drug business.").

Angela Bernard testified that she distributed in excess of 500 kilograms of cocaine that she received from Danielle Metz, and collected approximately $3,500,000, which she turned over to Danielle Metz.  In addition, the evidence demonstrated that, in two separate transactions, Miranda Roebuck gave a total of $136,000 directly to Danielle Metz in exchange for 8 kilograms of cocaine.  The evidence also demonstrated that Danielle Metz delivered $109,000 to purchase 40 acres of land, another $19,000 for several lots, and had $67,000 in cash and $70,000 in jewelry in safe deposit boxes under her control.  This evidence was more than sufficient to satisfy the government's burden.

## B.  Supervision, Organization or Management of Five Persons

As summarized by the Second Circuit,

In assessing the sufficiency of the evidence to support the verdict that Roman supervised or managed at least five others, we note that generally a management or supervisory relationship within the meaning of § 848 is "created when one person gives orders or directions to another person who carries them out."  The defendant on a CCE charge need not "have been the <u>dominant</u> organizer or manager as long as she was in a managerial position with respect to five other persons," nor does the statute require proof that there was "personal contact between the leader and each underling," or that all of the claimed relationships were of the same type or existed at the same moment in time.  Thus, the requisite associations and relationships may be found even in loosely structured enterprises.  Finally, we note also that in any review of the record for sufficiency, "`pieces of evidence must be viewed not in isolation, but in conjunction.'"

<u>United States v. Roman</u>, 870 F.2d 65, 73 (2nd Cir. 1989), <u>cert. denied</u>, 490 U.S. 1109, 109 S.Ct. 3164 (1989)(citations omitted, emphasis in original).

The evidence demonstrates that Appellant organized, supervised or managed, at minimum, Angela Bernard, Irvin McClue, Louis Gibbs, Rigoberto Rincon, Oliver Myles, Dwayne Sandifer, Miranda Roebuck, Moore and Tolliver.  Bernard testified that she received some of her payment for services from Danielle Metz, that she would receive cocaine from Appellant, and turn drug proceeds over to Appellant.

Danielle Metz directly oversaw the drug trafficking activities of Rigoberto Rincon, Tolliver and Moore.  She made arrangements for them to pick up and deliver drugs, and either directly received the proceeds or provided instructions for their delivery.  McClue and Gibbs appeared to have been in a subordinate relationship to Bernard, in that, at her direction, they would bring her quantities of cocaine once she had arranged a sale.  Since Bernard was subordinate to Appellant, McClue and Gibbs were indirectly managed

51

by Appellant.[45]  In addition, as set out above, Myles, Sandifer and Roebuck all testified that Angela Bernard and Danielle Metz were their contacts for receipt of the delivery of hundreds of kilograms of cocaine from the Metz organization.  Thus, they can be considered either directly subordinate to Appellant or indirectly subordinate through Angela Bernard.

The evidence was sufficient for the jury to conclude that Appellant managed at least five persons, and that she received substantial income from her drug trafficking activities.

## VIII.  POSSESSION WITH INTENT TO DISTRIBUTE

Danielle Metz next contends that the government failed to prove beyond a reasonable doubt that she possessed, with intent to distribute, in excess of five kilograms of cocaine as charged in count five of the indictment.  Appellant does not dispute that sufficient evidence was adduced, but, instead attacks the credibility of the government witnesses.  As discussed above, credibility is an issue for the jury, and we find no reason to overturn the jury on this issue.

## IX.  MONEY LAUNDERING

### A.  Tolliver

Tolliver argues that the government failed to establish his identity, with regard to the money laundering count, beyond a reasonable doubt.  Because the appellant asserts a ground of error not raised below, the judgment may be reversed only upon a finding

---

[45]  See United States v. Hinojosa, 958 F.2d 624, 630 (5th Cir. 1992).

52

of plain error. Fed. R. Crim. P. 52(b); <u>United States v.</u> <u>Calverley</u>, 37 F.3d at 162; <u>United States v. Yamin</u>, 868 F.2d 130, 132 (5th Cir.) <u>cert. denied</u>, 492 U.S. 924, 109 S.Ct. 3258 (1989). Although the government did not put on any specific evidence to show that the Appellant was the same "Sylvester Tolliver" who was an officer of United Investment Property and Land Development, Inc. (United Investment), substantial evidence was adduced to show "Sylvester Tolliver's" involvement in the money laundering transaction.

Lionel Ingram, the land developer who arranged the sale of the 40 acre parcel, testified that he "saw Sylvester Tolliver and Louis Gibbs" at the closing, and that they signed as officers of United Investment. John Coman, the attorney who incorporated United Investment, testified that Tolliver and Gibbs, "my clients at that time," were the incorporators of United Investment, that they came to his office and signed the incorporation documents. Neither Ingram nor Coman were asked to identify Tolliver in the courtroom. However, Appellant Danielle Metz made an in court identification of Tolliver, and named him as the carrier of several cashier's checks naming United Investments as the remitter. Based on the amount and nature of the evidence adduced, and the in court identification of Tolliver by Danielle Metz, we cannot say that any error occurred.

However, even assuming, <u>ad arguendo</u>, that the government should have supplied additional identification evidence, the error could in no way be considered plain. In <u>Calverley</u>, we quoted the Supreme Court's definition of "plain" errors as "errors which are

53

`obvious,' `clear,' or `readily apparent;' they are errors which are so conspicuous that `the trial judge and prosecutor were derelict in countenancing [them], even absent the defendant's timely assistance in detecting [them].'" Calverley, 37 F.3d at 163. We cannot say that Tolliver's asserted error comes anywhere close to this standard.

In addition to the evidence adduced, and the lack of any assertion by Tolliver that his identity was in question, Tolliver's attorney in both opening and closing argument implied that Tolliver was involved in the transaction, but lacked any intent to "conceal."

In opening argument, Tolliver's counsel stated,

> Finally, there is the money laundering count. There was this corporation formed. The Government will introduce this evidence. Sylvester Tolliver did not attempt to conceal anything. He invested $5,000 of his money to buy this land. He signed the incorporation documents in his own name. He was an incorporator. He was secretary and he was the director. He did nothing to conceal it. It's our position that concealment is the essence of money laundering.

During closing argument, Tolliver's counsel reiterated the same theory of defense,

> You next would have to determine that Sylvester Tolliver knew that his was a scheme, that he didn't know this was a legitimate business involvement. And I would say to you that he signed on as an officer of the corporation [United Investments]. He signed on the purchase documents. If he were really trying to conceal something, why would he use his real name.

The simple fact is that Tolliver's present assertion of error is in direct conflict with his trial strategy. We can say neither that

error was committed nor that error, if any, would have been "plain."

## B.  Danielle Metz

Danielle Metz contends that the government's evidence was insufficient to prove the money laundering charge in count six of the indictment.  Specifically, Appellant contends that the government failed to show, beyond a reasonable doubt, that she knew that the money used in the financial transaction was drug money, and that she was using the financial transaction to conceal the ownership of the drug money.  To show a violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that the Appellant knew that the source of the funds was illicit and that the laundering was done with the intent to conceal or disguise the nature, location, source, ownership, or control of the property." United States v. Garza, 42 F.2d 251, 253 (5th Cir. 1994).

Danielle Metz's was involved in the negotiation for the property and made most if not all of the payments on the property. The jury could conclude that she knew the source of the funds was illicit due to the overwhelming evidence of her participation in the drug conspiracy and her lack of a legitimate source of income. Based on the testimony of the attorney who incorporated United Investment, the jury could also conclude that the transaction was conducted with the intent to conceal the true ownership of the property.  The attorney testified that he knew that Glenn Metz "had an interest" in the transaction, yet Glenn Metz did not participate in the incorporation, did not hold any stock in the corporation and

55

was not an officer or director of the corporation. The government thereby satisfied its burden of proof.

## X. RACKETEERING

Elwood and Helmstetter appeal the sufficiency of the evidence to support their convictions for violations of 18 U.S.C. § 1959 arising out of the murders of Michael Wilson and Donald Ellis and the assault of Wilfred Carr. Appellants base their argument on the allegedly improper evidentiary rulings of the trial court and the credibility of the remaining witnesses. Having affirmed the district court's evidentiary rulings, we find sufficient evidence in the record to support the racketeering convictions.

## XI. FIREARMS COUNTS

Appellants Elwood, Helmstetter, Sterling and Moore all argue that the government's evidence was insufficient to show that they possessed firearms in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Elwood's argument centers on whether the government proved he "possessed" a firearm. Helmstetter, Sterling and Moore contend that while the evidence may have been sufficient to show possession of firearms, the government failed to prove that the firearms were used in connection with drug trafficking.

### A. Standard of Review

To prove commission of the firearms offense, "the government must establish that the defendant `used or carried' a firearm `during and in relation' to a drug trafficking crime." United

56

States v. Raborn, 872 F.2d 589, 594-95 (5th Cir. 1989). As we have

stated,

> The government may meet its burden [under 18 U.S.C. §
> 924(c)] by showing that the weapon involved could have
> been used to protect, facilitate, or have the potential
> of facilitating the operation, and the presence of the
> weapon was in some way connected with the drug
> trafficking.

United States v. Blake, 941 F.2d 334, 342 (5th Cir. 1991), cert.

denied, ___ U.S. ___, 113 S.Ct. 596 (1992). Proof that the firearm

was used in relation to the drug trafficking crimes for which

Appellants were convicted "does not depend on proof that the

defendant had actual possession of the weapon or used it in any

affirmative manner, but it does require evidence that the firearm

was available to provide protection to the defendant in connection

with his engagement in drug trafficking." United States v. Raborn,

872 F.2d at 595.

## B.  Elwood

Elwood was convicted of firearms offenses in counts sixteen

and seventeen. The evidence in support of his conviction on count

sixteen is obvious, the firearms were seized--from a locked bedroom

in which Appellant was sleeping--during the execution of a search

warrant. The evidence linking Elwood to the firearms in count

seventeen is more circumstantial, but nonetheless sufficient. The

count seventeen firearms were seized from the same location,

approximately two months after the execution of the prior warrant.

Based on the totality of the evidence, Elwood's affinity for

firearms and his prior occupancy of the residence, the jury's

decision to credit the government's evidence, and discount the

testimony of Appellant's witnesses was a credibility determination within their province.

## C. Helmstetter, Sterling and Moore

The record makes clear that all of the weapons at issue were seized from Appellants during their participation in an on-going drug distribution conspiracy. While it may be true that the weapons were not in the immediate proximity of illegal drugs, Appellants argument ignores the facts and the structure of the conspiracy. As stated in the PSR, the evidence shows that each of these Appellants had responsibility for firearms in addition to drug distribution. "Noah Moore, Jr., the brother of Glenn Metz, was a distributor of cocaine, a firearms procurer and storer, and a gunman for the organization....Marlo Helmstetter was a firearms procurer and a gunman....Shane Sterling was a distributor of cocaine and a firearms procurer and storer." The fact that their "job descriptions" did not require Appellants to possess drugs and firearms simultaneously does not insulate them from § 924(c) liability.

## XII. SENTENCING ISSUES

## A. Quantity of Drugs

### 1. Standard of Review and Legal Framework

We review the district court's determination of the quantity of drugs attributable to the Appellant for clear error. See United States v. Mergerson, 4 F.3d 337, 345 (5th Cir. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1310 (1994); United States v. Mir, 919 F.2d 940, 943 (5th Cir. 1990). A defendant's base offense level for

58

drug-trafficking offenses may be based on both "drugs with which the defendant was directly involved [under U.S.S.G. § 1B1.3(a)(1)(A)], and drugs that can be attributed to the defendant in a conspiracy as part of his `relevant conduct' under [U.S.S.G.] § 1B1.3(a)(1)(B)." United States v. Carreon, 11 F.3d 1225, 1230 (5th Cir. 1994); see also U.S.S.G. § 2D1.1(a)(3). "Relevant conduct" includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Carreon, 11 F.3d at 1230 (emphasis in original). Conduct may be relevant regardless whether it occurred during the commission of the offense of conviction, in preparation for the offense or during an attempt to avoid detection or responsibility for the offense. U.S.S.G. § 1B1.3(a)(1)(B).

In making its sentencing decisions, a district court may consider any relevant evidence that "has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). "[A] presentence report generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making factual determinations required by the sentencing guidelines." United States v. Alfaro, 919 F.2d 962, 966 (5th Cir. 1990). A sentencing court may "adopt facts contained in a PSR without inquiry, if those facts had an adequate evidentiary basis and the defendant does not present rebuttal evidence." United States v. Puig-Infante, 19 F.3d 929, 943 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 180 (1994).

59

"If information is presented to the sentencing judge with which the defendant would take issue, the defendant bears the burden of demonstrating that the information cannot be relied upon because it is materially untrue, inaccurate or unreliable." United States v. Angulo, 927 F.2d 202, 205 (5th Cir. 1991). Objections in the form of unsworn assertions do not bear sufficient indicia of reliability to be considered. United States v. Lghodaro, 967 F.2d 1028, 1030 (5th Cir. 1992).

**2. Sterling**

<u>a. Foreseeability</u>

Sterling claims that the district court incorrectly concluded--for sentencing purposes--that he could reasonably foresee transactions in the conspiracy involving at least 57 kilograms of cocaine. Addressing Sterling's objection at sentencing, the district court made specific findings, wherein he referenced the evidence in the record to support his finding that Sterling could reasonably foresee that the conspiracy with which he was involved was dealing in very large quantities of cocaine. At the conclusion of the factual recitation--which encompasses over two full pages of transcript--the court stated to defense counsel,

> Now when I look at all that together I say it's reasonable, it seems to me, by a preponderance of the evidence to find that Mr. Sterling knew or should have known that quantities of cocaine were being distributed in this organization in excess of fifty kilos. Now if you disagree with me, you tell me why?

Defense counsel responded, "I cannot argue with you at that point, Your Honor." Sterling falls well short of "demonstrating that the information cannot be relied upon because it is materially untrue,

60

inaccurate or unreliable."  There is no basis upon which to conclude that the district court's finding was clearly erroneous.

### b.  Double Jeopardy

Sterling also contends that because the court directed a judgment of acquittal on Lawrence and Tolliver's conspiracy convictions, the quantities of drugs involved should not have been used on his sentence.  We find no merit to this argument.  Whether or not the government was prohibited from re-trying Lawrence and Tolliver on double jeopardy grounds, the government was entitled to present evidence of the conspiracy against the remaining defendants.  We find no error in the inclusion of this amount in the determination of Sterling's sentence.

### 3.  Moore

Moore also contends that the district court failed to make the requisite factual findings as to the amount of cocaine attributable to or reasonably foreseeable by Moore.  The district court made extensive findings, comprising almost three pages of transcript, wherein he set forth the evidence supporting his sentencing of Moore based on in excess of 50 kilograms of cocaine.  In summary, the court stated,

> So just seems to me when I look at his activities, his relationship to the Metz Organization, his conversations, his notebook, that it's [sic] at least by a preponderance of the evidence Mr. Moore knew or reasonably should have been able to foresee that the Metz Organization with which he was involved and convicted as a conspirator was dealing in cocaine in excess of fifty kilos.  And so accordingly, that's what I find that as to Moore <u>at least as much as charged in the indictment, probably more</u>.  And the indictment specifically mentions fifty-seven kilos in Count One and <u>it's at least that much</u> and <u>I think that is the minimum amount</u>.

(emphasis supplied).  As suggested by the district court, the evidence shows that Moore was personally involved with in excess of fifty kilograms of cocaine.  We have no difficulty in affirming the district court's determination that Moore personally knew or, at least could reasonably foresee that the Metz organization engaged in the distribution of at minimum fifty kilograms of cocaine during Moore's involvement in the conspiracy.

## B.   Sentencing on Count One Conspiracy

Arthur claims that the district court erred in sentencing him to life on the count one conspiracy in accordance with the multiple count sentencing guidelines U.S.S.G. §§ 3D1.1 and 5G1.2.  Instead, Appellant contends that his sentence on the count one conspiracy should have been 155 to 188 months in accordance with the relevant conduct provisions contained in U.S.S.G. § 1B1.3.  However, Appellant concedes that the sentence on the count one conspiracy is moot if we affirm the sentences on counts nine and ten.  Because, as discussed below, we affirm the district court's imposition of life sentences on counts nine and ten, we do not address Appellant's argument regarding the life sentence on count one.

## C.   Sentencing on Count Nine and Ten Racketeering Charges

Arthur and Helmstetter argue that the district judge erred in sentencing them to life imprisonment on the count nine and ten racketeering charges under 18 U.S.C. § 1959(b)(1) and § 1961(1). Appellants contend that the indictment charged that the underlying crimes were murders in the second degree under Louisiana law, and that the district court should have used the federal guideline for

62

second degree murder to determine their base offense level. All parties agree that the starting point in the sentencing analysis is U.S.S.G. § 2E1.3 which provides that the base offense level for a conviction under 18 U.S.C. § 1959 shall be the greater of "12" or "the offense level applicable to the underlying crime or racketeering activity." Application note one provides "[i]f the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used."

Thus, the district court was bound to determine the federal offense most analogous to the underlying conduct. We next turn to the language of the indictment. In relevant part, count nine provided,

> On or about April 5, 1990, in the Parish of Jefferson, within the Eastern District of Louisiana, for the purpose of maintaining and increasing position in an enterprise engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), the defendants GERALD ELWOOD, a/k/a "Nap", a/k/a "Keith McCoy", a/k/a "Homey", GENNERO ARTHUR, a/k/a "Meatball", and MARLO HELMSTETTER, a/k/a "Lo", together with other persons unknown to the Grand Jury, <u>did knowingly and intentionally murder</u> and did aid and abet the murder of Michael Wilson by shooting him with a firearm in violation of the laws of the State of Louisiana, that is, Title 14, Louisiana Revised Statutes, Section 30.1; all in violation of Title 18, United States Code, Sections 1959(a)(1) and 2.

(emphasis supplied). With the exception of the substitution of "Donna Ellis" for "Michael Wilson," count ten was identical. Next, we compare the underlying state law with the analogous federal provision.

Louisiana defines second degree murder as follows:

A. Second degree murder is the killing of a human being:

63

> (1) when the offender has a <u>specific intent</u>
> <u>to kill or to inflict great bodily harm</u>.

La. Rev. Stat. Ann. § 14:30.1 (West Supp. 1995)(emphasis supplied).

The United States Code defines murder as follows:

> (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, <u>or any other kind of willful, deliberate, malicious, and premeditated killing</u>; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C. § 1111 (emphasis supplied). As stated by the district court, first degree murder is the federal crime most analogous to the Louisiana second degree murder statute.[46]

Nonetheless, Appellants assert <u>United States v. McCall</u>[47] for the proposition that because the Louisiana offense of second degree murder is the "offense of conviction," the most analogous federal crime is second degree murder. Appellants' interpretation belies both the holding in <u>McCall</u> and the plain reading of the guidelines. The sentence in <u>McCall</u> was overturned because the indictment did not specify "intent," and therefore "intent" was not an element of

---

[46] <u>See</u> <u>United States v. Minicone</u>, 960 F.2d 1099, 1110 (2nd Cir. 1992), <u>cert. denied</u>, 503 U.S. 950, 112 S.Ct. 1511 (1992)(Most analogous federal offense to second degree murder conviction under New York law was first degree murder); <u>United States v. Paden</u>, 908 F.2d 1229, 1238 (5th Cir. 1990)(Most analogous offense to state law arson offense was second degree murder).

[47] 915 F.2d 811, 814-15 (2nd Cir. 1990).

64

the offense charged.[48] In the instant case, intent is an element of the offense charged, and therefore <u>McCall</u> is not persuasive.[49] In addition, the language of the guidelines instructs the court to compare the conduct, not the titles of the statutes cited. As pointed out by the district court, different states have different labels for the same crime,

> [t]herefore, depending upon which state murder statute is charged as the underlying offense of "premeditated murder or killing with specific intent," inconsistent sentences for identical illegal conduct would be imposed in different states if the base offense level was computed merely by looking at the "label" of such statute and having that label be determinative of the most analogous federal offense, rather than looking at the actual substance of the underlying state statute to determine the most analogous federal offense.

The district court properly compared the "substance" of the underlying offense, and did not err in concluding that first degree murder was the most analogous federal offense.

## D. Consecutive Sentences on Gun Counts

---

[48] <u>See</u> <u>McCall</u>, 915 F.2d at 814-15,

> The government contends that "[t]wo separate offense guideline sections, [Sections 2A1.1 and 2A2.2] cover the criminal conduct charged in the information." That is wrong. The information does not charge McCall with the essential element of intent to commit murder. The district court found as a fact at the sentencing hearing that McCall's acts showed a "depraved indifference to human life, and therefore an intent to murder." That fact is irrelevant to selecting the applicable Guidelines section, however, because that section must be determined by the offense of conviction.

[49] We do not decide whether an element of the crime has to be included in the indictment to be considered in determining the most analogous federal crime.

65

Sterling contends, and the government correctly concedes, that under our precedent he was improperly sentenced to three consecutive 60 month terms under 18 U.S.C. § 924(c). United States v. Privette, 947 F.2d 1259, 1262-63 (5th Cir. 1991)(citations omitted), cert. denied, 503 U.S. 912, 112 S.Ct. 1279 (1992). It is plain that the three § 924(c) charges were each predicated on the count one conspiracy and therefore the sentence violates our ruling in Privette. While the government suggests that we may wish to reconsider our ruling in Privette in light of more recent rulings by the Fourth[50] and D.C. Circuits,[51] any reconsideration of Privette is a task for the en banc court on another day.[52] We are bound by our prior holding and in accordance with the procedure set forth therein, we vacate the sentences and remand with instructions that two of the § 924(c) counts, as elected by the government, be dismissed and Sterling be resentenced. See Privette, 947 F.2d at 1263.

## XIII. INEFFECTIVE ASSISTANCE OF COUNSEL

Moore and Glenn Metz contend that their respective trial counsel ineffectively represented them. Specifically, Moore contends that his trial counsel failed to raise his juvenile status

---

[50] United States v. Camps, 32 F.3d 102, 106-08 (4th Cir. 1994).

[51] United States v. Anderson, 39 F.3d 331, 353-57 (D.C.Cir. 1994).

[52] We note that our prior holding falls in the majority of circuits that have spoken on this issue. The holdings of the Second, Ninth, Tenth and Eleventh Circuits are consistent with our jurisprudence, while the D.C., Fourth and Sixth Circuits adopt the view that multiple § 924(c) counts may be charged for separate incidents occurring within the same conspiracy.

as a jurisdictional bar to his trial. Metz, on the other hand, provides a veritable laundry list of alleged deficiencies including, <u>inter alia</u>, that his attorney: (1) improperly handled his motion to suppress; (2) was not available to him; (3) failed to file certain unspecified motions; (4) used poor trial strategy; (5) failed to move for a change of venue or recusal of the judge; (6) failed to submit <u>voir dire</u> questions regarding racial prejudice; (7) failed to request jury sequestration; (8) lacked familiarity with the rules of evidence; (9) failed to request certain unspecified jury instructions; (10) failed to object to the court's money laundering instruction, (11) abandoned him at the sentencing proceedings, thereby resulting in improper multiple sentences on his CCE and conspiracy convictions. None of Appellants' claims were raised before the district court.

The general rule in this circuit is that we will not address ineffective assistance of counsel claims on direct appeal unless they have been raised before the district court. <u>See</u> <u>United States v. McCaskey</u>, 9 F.3d 368, 380 (5th Cir. 1993), <u>cert. denied</u>, 114 S.Ct. 1565 (1994). "Exception to this general rule is made only if the record is sufficiently developed with respect to the merits of the claim." <u>Id</u>. at 381. Our standard of review on an ineffective assistance of counsel claim is well settled. To prove ineffective assistance, the appellant must show that "(1) the attorney's representation fell below an objective standard of reasonableness; (2) there is a reasonable probability that except for the attorney's unprofessional errors, the results of the proceeding

67

would have been different."  United States v. Kinsey, 917 F.2d 181, 183 (5th Cir. 1990), citing, Strickland v. Washington, 466 U.S. 668, 687-88, 694, 104 S.Ct. 2052, 2064-65, 2068 (1984).

## A.  Moore

We find that the record is sufficient to evaluate Moore's claim that his counsel was ineffective for failing to raise the jurisdictional implications of his juvenile status.  However, as discussed above in Section II.D., the district court had jurisdiction to try Moore as an adult.  Therefore, Moore cannot satisfy either prong of the Strickland test.

## B.  Glenn Metz

The majority of Metz's claims, though facially specious, are not sufficiently developed either in Appellant's brief or on this record, and therefore not the proper subject of review on direct appeal.  However, two issues can be disposed at this time.  First, Appellant claims that his counsel was ineffective for failing to file a Batson challenge.  As discussed above in Section III.B., Danielle Metz's counsel lodged a Batson challenge on behalf of all Appellants, that was properly denied by the trial court.  Appellant cannot satisfy either prong of the Strickland test on this claim.

Second, Appellant claims that his counsel "abandoned" him at sentencing, and, as a result, he was improperly sentenced on both the count one conspiracy and the CCE count.  The law is well settled on this issue.  In Jeffers v. United States,[53] the Supreme Court found that conspiracy was a lesser included offense of a CCE

---

[53]    432 U.S. 137, 157-58, 97 S.Ct. 2207, 2219-20 (1977).

charge. See United States v. Devine, 934 F.2d 1325, 1342 (5th Cir. 1991). Therefore, while a defendant may be indicted for a conspiracy and a CCE, he may not be sentenced on both charges. As we have stated previously, the proper remedy in this situation is to vacate Metz's conviction and sentence on the count one conspiracy.[54] Id. at 1343.

However, Appellant's contention that his attorney's failure to object to the sentence deprived him of effective assistance of counsel is without merit. As noted in footnote 54, the dual sentencing is of no real consequence in this circumstance. Therefore, Appellant cannot establish the second prong of the Strickland test.

Appellant's remaining contentions are dismissed, without prejudice, as not ripe for appellate review.

## XIV. CONCLUSION

We vacate Sterling's multiple sentences on the § 924(c) counts and remand with instructions that two of the counts, as elected by the government, be dismissed and Sterling be resentenced. We also vacate Glenn Metz's conviction and sentence on the count one conspiracy, and dismiss those portions of his appeal, related to his ineffective assistance of counsel claim, that are not directly

---

[54] We note that Danielle Metz's was also improperly sentenced on the count one conspiracy for the same reason, however, she did not raise the issue on appeal and we are without appellate jurisdiction to address the issue. However, since both Danielle and Glenn Metz are serving life sentences on the CCE, the concurrent life sentences on the conspiracy count are of no real consequence.

addressed herein without prejudice.  In all other respects, the district court is affirmed.

AFFIRMED in part, VACATED in part, DISMISSED in part and REMANDED in part for resentencing.