# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 28, 2011

No. 10-10528

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

JAMES JOHNATHAN COLE; JOSE ROBLEDO NAVA,

Defendants–Appellants

Appeals from the United States District Court
for the Northern District of Texas
5:09-CR-0004-C-BG-10
5:09-CR-0004-C-BG-1

Before HIGGINBOTHAM, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellant James Johnathan Cole appeals his conviction for conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana. Cole and Defendant–Appellant Jose Robledo Nava also appeal their convictions for two counts of using a firearm to commit murder during and in relation to a drug-trafficking crime. The Almighty Latin King and Queen Nation ("Latin Kings")

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-10528

is a national gang that actively traffics drugs in Texas.  Nava was the highest-ranking member in Texas.  Cole was a low-level member.  Cole participated in a drive-by shooting in May 2008, in which he fired an AK-47 assault rifle at members of a rival drug-dealing gang, killing Michael Cardona and Valeria Garcia and injuring three others.

Because the defendants failed to move for a judgment of acquittal, we review their insufficiency-of-the-evidence claims under a manifest-miscarriage-of-justice standard.  We find no manifest miscarriage of justice here.  Accordingly, we affirm the convictions.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**A.    Factual Background[1]**

### 1.    Latin Kings's Drug-Trafficking Activities

Nava, also known and referred to as "Chino," and Cole, also known and referred to as "Blitz," were members of the Latin Kings, a gang based in Chicago that operates and actively deals drugs in Texas.  Nava's family members had also joined the Latin Kings.  Evidence at trial demonstrated that Nava and other members of the Latin Kings trafficked cocaine and marijuana between 2001 and December 2008: Nava had multiple suppliers; he diluted bricks of cocaine with inositol powder to increase the amount of powder available for resale; and he and other Latin Kings sold drugs from multiple houses in Big Spring, Texas that Nava controlled and in which Nava and other Latin Kings resided.  By 2005, Nava was elected to become State Representative, the highest-ranking Latin Kings' member in the state who acts as a representative to gang leadership in Chicago.

---

[1]    Given the standard of review in this case, we recite the facts in the light most favorable to the verdict.  *United States v. Sam*, 467 F.3d 857, 859–60 (5th Cir. 2006).

No. 10-10528

## 2.    The Latin Kings and the Rios Family

At first, the Latin Kings and the Rios family, another drug-dealing organization, coexisted without violence. The houses controlled by Nava and the Latin Kings were in the same neighborhood and on the same streets as houses controlled by the Rios family. The two organizations and their respective associates bought and sold drugs to each other, and at least once traded guns for drugs. By 2006, however, the Latin Kings and the Rioses' relationship had deteriorated. The two organizations had started competing over drug customers, and there was growing tension over who was purchasing product from and supplying product to different members of each organization.

The conflict was further exacerbated by a love triangle that developed between Tony Jeanette Martinez, Antonio Flores, and Ernesto "Negro" Trevino in August 2007. Jeanette Martinez was divorcing Flores, an associate of and drug supplier to the Rios family, when she began dating Trevino, a Latin King. At first, Trevino and Flores got along despite Trevino dating Martinez, but Flores became aggressive toward Trevino when Flores saw Trevino in the company of other Latin Kings.

In October 2007, Flores threw a beer bottle at Trevino, Martinez, and another Latin King named Domingo Robledo as they drove past one of the Rioses' houses. In response, Robledo fired shots at Flores and shortly thereafter, on Nava's instructions, retrieved an AK-47 to shoot at Flores when Flores pursued Robledo to one of Nava's houses. Following this encounter, the Rioses and the Latin Kings engaged in a string of violent incidents that included drive-by shootings and attempts to burn each other's homes.

## 3.    Cole's Involvement and the May 4 Shooting

On March 26, 2008, two Rios family members shot Jose Nava and injured Robert Ramirez, also known as "Nesyo." In response, Nava stated that it "wasn't going to be left like that." Nava's brother, Luis, summoned Latin Kings from

No. 10-10528

outside of Big Spring to provide additional security for Nava and to execute drive-by shootings. Cole was among them.

Cole served as a guard outside of Nava's house. On May 3, 2008, Cole and Ricky Nava, Jose Nava's younger brother, fired shots at the Rioses at a local auto body shop. In response, the Rioses conducted a drive-by shooting at the home of Reynaldo Nava, brother to Jose and Ricky, later that night. Jose, Luis, Reynaldo, Cole, Ramirez, and other Latin Kings met at Jose Nava's house the next day. Luis, Ramirez, and Cole left to reconnoiter a Rios family gathering and informed the group that it was a good time to attack the Rios family as many of the Rioses had gathered there. Ramirez then devised the plan: he would drive in one car with another Latin King, and Cole would follow in a truck driven by Cole's friend, Gabriel Gonzales, who had agreed to participate in the drive-by shooting. In recruiting Gonzales to drive the second car, Ramirez informed him that they were going to execute the drive-by shooting because the Rioses were "stepping on [the Latin Kings's] toes," in other words, because the Rioses were "coming into the [Latin Kings's] turf, selling drugs." Jose Nava instructed Ramirez to retrieve an AK-47 from another Latin King's home. Cole fired the AK-47 during the drive-by shooting, killing Michael Cardona and Valeria Garcia and injuring three others.

## B.    Procedural Background

The police arrested Nava in December 2008 and Cole in January 2009. On January 13, 2010, a federal grand jury returned a Second Superceding Indictment against Cole and Nava. The indictment charged Nava with six counts: (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841, 846; (2) possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841; (3) possession of stolen firearms, in violation of 18 U.S.C. §§ 922, 924; (4) conspiracy to engage in the

business of dealing firearms, in violation of 18 U.S.C. § 371; (5) using and carrying a firearm to commit murder during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(j), for the murder of Valerie Garcia; and (6) using and carrying a firearm to commit murder during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(j), for the murder of Michael Cardona.  Cole was charged with Counts One, Five, and Six.

On February 16, 2010, a seven-day jury trial began.  On February 24, 2010, the jury found Nava guilty on all six counts and Cole guilty of the three counts with which he was charged.  On May 13, 2010, the district court sentenced Nava and Cole to concurrent terms of life imprisonment for their convictions on Counts One, Five, and Six.  The district court sentenced Nava to an additional 480 months for Count Two, 120 months for Count 3, and 60 months for Count 4—all to be served concurrently with the life terms.

Cole and Nava timely appealed.  Cole appeals the convictions under Counts One, Five, and Six for insufficiency of the evidence.  Nava appeals his convictions under Counts Five and Six for insufficiency of the evidence.

## II. STANDARD OF REVIEW

"The usual standard of review for a sufficiency-of-the-evidence challenge is to consider the evidence in the light most favorable to the verdict, accepting all reasonable inferences that support it, in deciding whether a rational jury could have found the elements of the offense beyond a reasonable doubt." *United States v. Sam*, 467 F.3d 857, 859–60 (5th Cir. 2006) (citing *United States v. Baker*, 17 F.3d 94, 96 (5th Cir. 1994)).  When a defendant fails to move for a judgment of acquittal at all or fails to renew a motion for judgment of acquittal at the close of evidence, however, we review the defendant's claim on appeal under a much stricter standard.  *Sam*, 467 F.3d at 861 (citing *United States v. Green*, 293 F.3d 886, 895 (5th Cir. 2002)).  In such cases, we review only for "a manifest miscarriage of justice, which is found if the record is devoid of evidence pointing to guilt . . . or if the evidence on a key element of the offense was so

5

tenuous that a conviction would be shocking." *Id.* (internal quotation marks omitted) (citing *United States v. Ruiz*, 860 F.2d 615, 617 (5th Cir. 1988)).

Neither Cole nor Nava moved for a judgment of acquittal after the Government closed its evidence, after the close of all the evidence, or within fourteen days after the court discharged the jury. *See* FED. R. CRIM. P. 29. Accordingly, we analyze the issues on appeal using the manifest-miscarriage-of-justice standard of review. As with the regular standard of review for insufficiency-of-the-evidence claims, we considersthe evidence "in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices." *Ruiz*, 860 F.2d at 617.

## III.  DISCUSSION

### A.    Cole's Conviction for Conspiracy to Distribute and Possess with Intent to Distribute Drugs.

Cole appeals his conviction under Count One, which charged him with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(B)(vii), 846 for conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana.

The elements of the offense of conspiracy to distribute and possess with intent to distribute drugs are "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy." *United States v. Booker*, 334 F.3d 406, 409 (5th Cir. 2003) (citing *United States v. Gallardo–Trapero*, 185 F.3d 307, 316–17 (5th Cir. 1999)). Each of the elements may be inferred from circumstantial evidence. *United States v. Espinoza–Seanez*, 862 F.2d 526, 537 (5th Cir. 1988). "An agreement may be inferred from 'concert of action.'" *Id.* (quoting *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982)). "Knowledge may be inferred from 'surrounding circumstances.'" *Id.* (quoting *Vergara*, 687 F.2d at 61)). "Voluntary participation may be inferred from 'a collocation of circumstances.'" *Id.* (quoting *United States*

6

*v. Marx*, 635 F.2d 436, 439 (5th Cir. 1981)).   "Mere presence or association with actual conspirators 'standing alone, will not support an inference of participation in the conspiracy.'" *Gallardo–Trapero*, 185 F.3d at 317; *United States v. Cortinas*, 142 F.3d 242, 249 (5th Cir. 1998).   But, "when combined with other relevant circumstantial evidence, these factors may constitute sufficient evidence to support a conspiracy conviction."   *Cortinas*, 142 F.3d at 249.

Cole's arguments are a bit muddled, but he first seems to argue that the evidence is insufficient because the government relied on circumstantial evidence, rather than direct evidence, to prove his knowledge of the drug-trafficking conspiracy and his voluntary participation in furthering the conspiracy.   Cole further argues that from the circumstantial evidence presented at trial—which showed he served as a guard for Nava starting in late March 2008 and fired shots at Rios gang members on May 3 and 4, 2008—one cannot conclude he had knowledge of the Latin Kings's drug-dealing operations.   He argues that he was merely providing personal security for Jose Nava, and that any shots he fired at the Rios gang was in response to the escalating violent conflict between the Latin Kings and the Rioses over Toni Jeanette Martinez, moving in with a Latin King rather than in response to competition between the Rios family and the Latin Kings for drug customers.   Cole concedes that the record is rife with evidence showing the existence of an agreement among the Latin Kings to distribute marijuana and cocaine.   Thus, we need only determine whether there is some evidence showing Cole knew of the conspiracy and that he voluntarily participated in it.

First, Cole's reliance on *Ingram v. United States*, 360 U.S. 672 (1959), and *Direct Sales v. United States*, 319 U.S. 703 (1943), is unavailing.   Though the cases do stand for the proposition that the Government must establish knowledge and intent to obtain a conspiracy conviction, the cases do not stand for the proposition that the Government must prove conspiracy by direct evidence rather than circumstantial evidence.   In *Ingram*, the Supreme Court

reversed the conviction of two low-level clerical functionaries for conspiracy to evade and defeat payment of federal taxes because there was no direct evidence nor any *convincing* circumstantial evidence that the two functionaries knew that the two main conspirators owed taxes. *See* 360 U.S. at 678–80. In *Direct Sales*, the Supreme Court explicitly stated that sometimes "the proof, by the very nature of the crime, must be circumstantial and therefore inferential." 319 U.S. at 714. The *Direct Sales* Court then went on to affirm the conviction of a pharmaceutical wholesaler for conspiracy to further, promote, or cooperate in a buyer's illegal use of narcotics in violation of the Harrison Anti-Narcotics Act using circumstantial evidence.

As Cole himself concedes, a defendant's knowledge of and participation in the conspiracy can be inferred from circumstantial evidence. *See Espinoza–Seanez*, 862 F.2d at 537. There is more than enough evidence to affirm Cole's conspiracy conviction under the manifest-miscarriage-of-justice standard: there is evidence that Cole knew of the Latin Kings's drug-dealing activities and that he voluntary participated in the conspiracy by acting as a gunman and enforcer for the organization.

### 1.    Knowledge

There is sufficient evidence to support a finding that Cole knew of the drug conspiracy. It is undisputed that Cole was a Latin King, rather than merely an outside contractor brought in to provide security. Cole lived with and bought drugs from Jesse Martinez, who was Nava's cousin and who obtained the drugs from Nava, in Lamesa, Texas. Martinez testified that Cole was a Latin King. Additionally, the Government presented evidence concerning Cole's Web page on MySpace, a social-networking website. On the Web site, Cole (1) posted photos in which he was wearing Latin Kings colors of yellow and black and displaying Latin Kings gang signs; (2) listed "drug wars" as an interest; (3) posted a video entitled "Drug Wars," the lyrics of which include, "We call it drug wars when you love hogging the block. We call it drug wars when you always

8

running from cops. We call it drug wars when that dirty money don't stop. We call it drug wars, I don't care, I'm setting up shop" and "We got Latin Kings and MS making blood spill"; (4) posted photos depicting Latin Kings members and Latin King symbols; and (5) posted an "ALKQN [Almighty Latin King and Queen Nation] poem." Finally, there is evidence that starting in late March 2008, Cole spent at least a couple of weeks posted outside of one of Nava's houses, which the Latin Kings used for drug business.

This evidence is not only sufficient to meet the manifest-miscarriage-of-justice standard, but the normal standard of review as well. From evidence presented concerning Cole's membership in the Latin Kings, his posts on MySpace demonstrating that he was aware that the Latin Kings dealt drugs, and his extended presence at a known Latin Kings drug house, jurors could rationally conclude beyond a reasonable doubt that Cole knew of the Latin Kings's conspiracy to distribute and possess with intent to distribute cocaine and marijuana.

### 2.   Voluntary Participation in the Conspiracy

There is also sufficient evidence under the manifest-miscarriage-of-justice standard to support a finding that Cole participated voluntarily in the drug-dealing conspiracy. Cole's primary argument is that the Government has failed to show that he personally participated in the transportation, sale, or distribution of the drugs or that he contributed to the financial needs of the conspiracy. But we have recognized that there are many different roles that participants in a drug conspiracy may play, for example: supervisor and manager, distributor, collector, courier, gunman and enforcer, and firearms procurer and storer. *See United States v. Tolliver*, 61 F.3d 1189, 1195 (5th Cir. 1995), *vacated on other grounds*, 519 U.S. 802 (1996), *remanded to* 116 F.3d 120 (5th Cir. 1997); *see also United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) (holding that enforcing discipline and chastising rivals can constitute purposeful behavior in furtherance of an ongoing drug-dealing conspiracy); *United States*

*v. Jenkins*, 419 F.3d 614, 620 (7th Cir. 2005) ("Different people play different roles in a drug conspiracy, be it supplier, lookout, courier, or enforcer."); *United States v. Soto–Benitez*, 356 F.3d 1, 18 (1st Cir. 2004) ("Advancing the aim of the conspiracy can involve performing ancillary functions such as processing and cooking drugs, procuring weapons, collecting monies, enforcing discipline, chastising rivals, accounting, and the like . . . ."). In *Tolliver*, we upheld the conviction of a gunman and enforcer on a drug-dealing conspiracy charge where the defendant attempted to kill a rival gang member as part of an ongoing "war" between the defendant's drug-dealing conspiracy and a rival drug organization. *Tolliver*, 61 F.3d at 1214.

Here, similar to *Tolliver*, there is also evidence that Cole was an enforcer and gunman for the Latin Kings and that he voluntarily participated in the drug-dealing conspiracy by acting as the "muscle" of the Latin Kings. Cole concedes that the evidence shows that he arrived in Big Spring in late March 2008 to provide security for Nava. Cole also concedes that he fired shots at Rios family members on May 3 and 4, 2008. Jesse Martinez testified that Cole had left Lamesa to go to Big Spring to "do security for the Latin Kings."

Cole argues that his providing security and shooting at the Rioses was fueled by the animosity between the two gangs over Jeanette Martinez rather than out of a desire to further the purposes of the drug-dealing conspiracy. There is some evidence that the conflict between the two organizations was at least exacerbated by Jeanette dating Trevino. Cole, however, mentions in his own brief that there was speculation in the record that the violence was not the result of the dispute over Jeanette Martinez, but the result of competition between the two gangs for drug customers. Gabriel Gonzales, a long-time friend of Cole's who drove the car the day of the May 4 drive-by shooting and who took the stand as part of a sentence-reduction deal, testified that another Latin King, Robert Ramirez, also known as Nesyo, indicated that Cole was going to execute

10

the May 4 drive-by shooting in retaliation for the Rios family's encroachment on Latin Kings territory:

> **Q.** And Nesyo tells you that some people are stepping on their toes?
>
> **A.** Yes, sir.
>
> **Q.** Now, do you know what that term, "stepping on toes," means?
>
> **A.** Yes, sir.
>
> **Q.** What does that mean to you?
>
> **A.** When somebody is coming into your turf, selling drugs or doing other things.
>
> **Q.** Interfering with your business?
>
> **A.** Yes, sir.
>
> **Q.** So he says that James—does he say James? What name did he refer to James Cole by at that point of the conversation?
>
> **A.** Blitz.
>
> **Q.** He said Blitz is going to handle up?
>
> **A.** Yes, sir.
>
> **Q.** What does he mean by "handle up"?
>
> **A.** I guess take care of the guys that are coming and stepping on their toes.
>
> **Q.** You guess?
>
> **A.** Well, that's what I know.
>
> **Q.** Okay. You believe he meant—when you say "take care," what do you mean, "take care of"?
>
> **A.** He's going to shoot them, take care of them.
>
> **Q.** And they are—they want you to do what?
>
> **A.** To drive.

In addition to Gonzales's testimony that the shooting was in response to the Rios family encroaching on the Latin Kings's territory, other witnesses also testified that the drive-by shootings and increasingly violent incidents between the two organizations were over drugs. Jesse Martinez, a former Latin Kings regional leader for Big Spring, testified about the source of the tension between the Latin Kings and the Rios family: "Chino was taking some of the Rioses' customers away. Well, some of the customers that were getting stuff from the Rioses came on to getting stuff from Chino, and that's where the problem started with them." Reynaldo Nava testified that the shootings on May 3 and 4 were an escalation of a conflict over drugs, among other things. Joe Canales, another

Latin King, also testified that the conflict between the Rios family and the Latin Kings had to do with drugs. Canales testified that there was internal conflict within the Rios family because two members of the Rios family were purchasing drugs from the Latin Kings rather than Antonio Flores. Flores was the main supplier from whom the rest of the Rios family bought their drugs.

Flores was also the Rios associate involved in the love triangle with Jeanette Martinez and Trevino. There was some testimony that the love triangle did not help matters, but other testimony indicates that Flores's aggression toward Trevino—which started the cycle of drive-by shootings in October 2007—was actually due to the underlying tension between the Rioses and the Latin Kings rather than over Jeanette Martinez. Trevino testified that at first Flores and Trevino got along despite Trevino being in the company of Martinez, and that Flores only became aggressive after Flores saw Trevino in the company of other Latin Kings.

As the above facts demonstrate, there is at least some evidence—and likely enough evidence to satisfy even the normal standard of review—that: (1) the violent conflict between the Latin Kings and the Rioses was over competition for drug customers rather than over a woman; (2) the shootings were to chastise the Rioses as economic rivals; and (3) Cole participated in and furthered the purposes of the drug-dealing conspiracy by providing security for the Latin Kings and acting as the gunman in the shootings to chastise the Rioses. Thus, we affirm Cole's conviction for conspiracy to distribute drugs.

**B.    Convictions for Using and Carrying a Firearm to Commit Murder During and in Relation to a Drug-Trafficking Crime**

Both Cole and Nava appeal their convictions under Counts Five and Six of the indictment. Counts Five and Six charged Nava and Cole with using and carrying a firearm to commit murder during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(j), for the murders of Valerie Garcia and Michael Cardona, respectively. We affirm Cole and Nava's § 924(j) convictions.

12

Title 18, Section 924(j) of the United States Code states:

A person who, in the course of a violation of subsection (c) [of this section], causes the death of a person through the use of a firearm, shall—

(1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life . . . .

There is a violation of § 924(c)(1) if "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who in furtherance of any such crime, possesses a firearm." A "drug trafficking crime" includes "any felony punishable under the Controlled Substances Act (21 U.S.C. § 801 et seq.)." 18 U.S.C. § 924(c)(2).

The Supreme Court has indicated that "use" under § 924(c) must constitute more than "simple possession with a floating intent to use." *See Bailey v. United States*, 516 U.S. 137, 144 (1995) (alteration marks and internal quotation marks omitted).[2] "Use" requires some measure of "active employment," though not necessarily "use as a weapon." *Id.* at 148. To illustrate what it meant by "active employment," the Supreme Court noted that "brandishing, displaying, bartering, striking with, . . . *firing or attempting to fire a firearm*, . . . referring to a firearm in his possession . . . [in a] calculated [attempt] to bring about a change in the circumstances of the predicate offense . . . [, or] the silent but obvious and forceful presence of a gun on a table" can constitute "use" under § 924(c)(1). *Id.* (emphasis added). In other words, there

___

[2] When the *Bailey* Court interpreted § 924(c)(1)(A), the statute did not include the "in furtherance" provision. 18 U.S.C. § 924(c) (1994). At the time *Bailey* was decided, § 924(c)(1) only required "the imposition of specified penalties if the defendant, 'during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm.'" *Bailey*, 516 U.S. at 142–43 (citing 18 U.S.C. § 924(c) (1994)). In response to the *Bailey* decision requiring "active employment" of a gun, Congress expanded the application of § 924(c) to situations where a person "who during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." *See* Pub. L. No. 105-386, 112 Stat. 3469 (codified as amended at 18 U.S.C. § 924(c)(1) (1998)).

must be sufficient evidence to show "a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at 143.

In order to satisfy the "during and in relation to" element of § 924(c)(1), "'the firearm must have some purpose or effect with respect to the drug trafficking crime.'" *United States v. Smith*, 481 F.3d 259, 264 (5th Cir. 2007) (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993)). To show that the use of firearms were "during and in relation to" a drug trafficking crime, there must be evidence that the defendant "used the weapon to protect or facilitate [a] drug operation, and that the weapons were in some way connected to the drug trafficking." *United States v. Baptiste*, 264 F.3d 578, 588 (5th Cir. 2001), *modified in other respects by United States v. Baptiste*, 309 F.3d 274 (5th Cir. 2002); *see also Tolliver*, 61 F.3d at 1218. We explained that "[t]his standard is satisfied if the weapons have the potential to facilitate the drug operation," *Baptiste*, 264 F.3d at 588, or if the "firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking." *Smith*, 481 F.3d at 264 (citation and internal quotation marks omitted); *see also United States v. Camps*, 32 F.3d 102, 105–06 (4th Cir. 1994) (holding there was sufficient evidence for a jury to conclude that firearms were used "during and in relation to" a drug trafficking conspiracy where the drug conspiracy was ongoing and conspirators fired on rival gang members in an "attempt[ ] to defend themselves against, and thus preserve their drug operation from, violence at the hands of their rival operator").

For example, in *Baptiste*, some of the members of a drug-dealing gang, the Seventh Ward Hardheads, started shooting members of another drug-dealing gang, the Rocheblave group, after a Rocheblave member killed two Hardheads. *Baptiste*, 264 F.3d at 583–84. The *Baptiste* Court held that the shooting of rival drug gang members were during and in relation to a drug crime where the "murders and attempted murders had at least the potential to protect the conspiracy and intimidate competitors and witnesses." *Id.* at 588.

The defendants do not dispute that Cole murdered Garcia and Cardona using an AK-47. Nor does Nava dispute that he is guilty of the § 924(j) count as a co-conspirator if Cole used the AK-47 "during and in relation to" the Latin Kings's drug-trafficking conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 645 ("[A]n overt act of one partner [in a conspiracy] may be the act of all without any new agreement specifically directed to the act." (citation and internal quotation marks omitted)). There is also no question that conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(b)(1)(A)(ii), 841(b)(1)(B)(vii), and 846 is a drug-trafficking crime. 18 U.S.C. § 924(c)(2). Thus, the only questions at issue are: (1) whether there is evidence that Cole's firing of the AK-47 to murder Cardona and Garcia constituted use of a firearm under § 924(c)(1); and (2) whether there is evidence that the use of the firearm was "during and in relation to" the conspiracy; in other words, whether there is evidence that Cole used the AK-47 to facilitate the Latin Kings's drug conspiracy.

Cole's firing of the AK-47 to murder Cardona and Garcia constituted use of a firearm during and in relation to a drug trafficking crime under § 924(c). Cole does not dispute that he fired the AK-47 and killed Cardona and Garcia. It is clear that firing the AK-47 constitutes "active employment" of a firearm as the Supreme Court specifically stated that "firing or attempting to fire a firearm" was the most obvious "active-employment understanding of 'use.'" *Bailey*, 516 U.S. at 148. Nor is there any question that the use of the weapon was purposeful rather than coincidental or accidental. The "use" element of § 924(c)(1) is satisfied beyond a reasonable doubt.[3]

---

[3] Cole urges us to apply the factors we laid out in *United States v. Ceballos–Torres*, 218 F.3d 409, 414 (5th Cir. 2000). *Ceballos–Torres*, however, does not control here because that case concerned whether a particular defendant's *possession* of a firearm furthered a drug-trafficking offense. *Id.* The case concerned a wholly different prong of the § 924(c)(1) that we need not examine because there is evidence establishing that Cole "used" the firearm.

There is also evidence that the shootings occurred during and in relation to the Latin Kings's drug-distribution conspiracy. The defendants argue that Cole shot at rival drug gang members for reasons unrelated to the Latin Kings's drug conspiracy: to take revenge on the Rioses for shooting Nava, Cole's own megalomania, or the love triangle between Flores, Trevino, and Jeanette Martinez. But, we need only find that there is some evidence of guilt and that there is enough evidence to support the "during and in relation to" element of the offense such that a conviction would not be shocking. *See Sam*, 467 F.3d at 861. As we discussed above, there is evidence that Cole executed the May 4 drive-by shooting in retaliation for the Rioses' economic encroachment on Latin Kings turf. Gonzales testified that Cole planned (and did) shoot at the Rioses on May 4 for stepping on the Latin Kings's "toes," i.e., "coming into [Latin King] turf, selling drugs." Martinez, a high-ranking officer of the Latin Kings, testified that the conflict between the Rioses and the Latin Kings arose because "Chino was taking some of the Rioses' customers away." Reynaldo Nava and Canales testified that the May 3 and 4 shootings were the result of a conflict over drugs, among other things. From this evidence, the jury could reasonably infer that Cole shot at the Rioses on May 4 to chastise rivals and intimidate economic competitors, thereby facilitating and protecting the drug conspiracy.[4] The record is neither devoid of evidence pointing to guilt nor is the evidence on a key element so tenuous that a conviction would be shocking. We affirm Cole and Nava's convictions under Counts Five and Six.

---

[4] Nava cites to a variety of cases for the proposition that the Government must demonstrate a nexus between the shootings and the drug conspiracy. In particular, Nava asks us to focus on a Fourth Circuit case, *United States v. Lipford*, 203 F.3d 259 (4th Cir. 2000), and our precedent in *United States v. Schmalzried*, 152 F.3d 354 (5th Cir. 1998). It is true that these cases stand for the rule that the Government must establish that the use, carriage, or possession of the firearm had "purpose or effect" with respect to the drug-trafficking crime. *Lipford*, 203 F.3d at 266; *Schmalzried*, 152 F.3d at 357. The Government carried this burden by presenting testimony that Cole shot at the Rioses because of a growing conflict over drug competition.

## IV. CONCLUSION

Here, we may only reverse the convictions if the record is devoid of evidence pointing to guilt or if the evidence on a key element of the offense is so tenuous that a conviction would be shocking. There is evidence in the record that a Latin Kings drug-trafficking conspiracy existed, Cole knew of the conspiracy, and Cole voluntarily participated in the conspiracy by shooting at the Rioses to chastise a rival drug-dealing gang. There is no manifest miscarriage of justice with respect to either Cole's conviction for conspiracy, or Cole and Nava's convictions for using a firearm during and in relation to the conspiracy.

AFFIRMED.

17